STATE OF CONNECTICUT *v.* EDWARD HAMELE, JR.

SPEZIALE, C. J., HEALEY, PARSKEY, ARMENTANO and SHEA, Js.

---

Argued June 8—decision released September 14, 1982

*Richard A. Fuchs,* for the appellant (defendant).

*Donald A. Browne,* state's attorney, with whom, on the brief, was *Frank S. Maco,* assistant state's attorney, for the appellee (state).

SPEZIALE, C. J. After a trial to a jury of six, the defendant, Edward J. Hamele, Jr., was found guilty of burglary in the first degree in violation of General Statutes § 53a-101 (a) (1), robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), and two counts of unlawful restraint in the second degree in violation of General Statutes § 53a-96. From the judgment rendered on the verdict, the defendant has appealed claiming that the trial

court erred (1) in refusing to exclude identification testimony because of a suggestive pretrial show-up; (2) in refusing to exclude testimony regarding physical evidence which was destroyed by the police; and (3) in refusing to exclude all reference to the defendant's prior criminal record. We find no error.

The jury reasonably could have found the following facts: At approximately 4:30 a.m. on May 14, 1977, the victims, a husband and wife, were awakened by an intruder in their Westport home. The intruder, who was carrying a gun and a flashlight, demanded money. After obtaining some money from the victims, the intruder forced the female victim to tie her husband with some stockings. After obtaining more money from the female victim's purse, the intruder then sexually assaulted her by forcing her to perform an act of oral sex. Following this, the female victim was also tied. A few minutes later the intruder left and the male victim called the police after freeing himself from his restraints. Because it was dark the victims had not been able to get a good look at the intruder's face, but were able to give the police a description of his general appearance, including his clothes, and of his voice, which was particularly distinctive in the pronounciation of certain words.

The defendant was stopped in his car a few minutes later by a Westport police officer about two and one-half miles from the victims' home. The officer observed that the defendant matched the description of the intruder which he had heard on the police broadcast regarding the incident. The officer found a gun and a flashlight in the defendant's car. After reading him his rights, the officer then took the defendant to the scene of the crime.

While at the victims' home, the defendant was shown to the victims three times. Each time the defendant was asked to stand outside of an exterior screen door so that the victims could observe him. During two of these show-ups, the defendant was asked to speak certain words which the intruder had spoken. The female victim, though unable to identify the defendant's face, made a positive identification of the defendant as the intruder based upon his build, dress, voice, and diction. The male victim was unable to make a positive identification, though he noted similarities between the defendant and the intruder.

## I

### IDENTIFICATION TESTIMONY

The defendant contends that the trial court erred in denying his motion to suppress the identification testimony of the victims because such testimony was tainted by an unnecessarily suggestive show-up.

During trial, both victims testified. As previously noted, only the female victim was able to identify positively the defendant during the show-up. No in-court identification of the defendant as the intruder was made. In court both victims identified the defendant only as the man they had been shown at their home a short time after the incident. Both victims testified about the show-up at the scene and the female victim testified that she had made a positive identification of the defendant at that time. She testified that because of the darkness she was unable to see the intruder's face, but that at the time of the show-up she was able to identify the defendant as the intruder by his build, dress, voice, and diction.

"In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was [impermissibly and] unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the 'totality of the circumstances.' [Citations omitted.]" *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980); see *State* v. *Brown,* 187 Conn. 602, 614–15, 447 A.2d 734 (1982); *State* v. *Ledbetter,* 185 Conn. 607, 611, 441 A.2d 595 (1981); *State* v. *Gordon,* 185 Conn. 402, 413, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982); *State* v. *Packard,* 184 Conn. 258, 262, 439 A.2d 983 (1981); *State* v. *Gold,* 180 Conn. 619, 656–58, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); *State* v. *Anderson,* 178 Conn. 287, 291, 422 A.2d 323 (1979); *State* v. *Piskorski,* 177 Conn. 677, 741, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); *State* v. *Willin,* 177 Conn. 248, 251–52, 413 A.2d 829 (1979); *State* v. *Smith,* 165 Conn. 680, 684, 345 A.2d 41 (1974); see also *Manson* v. *Brathwaite,* 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *Neil* v. *Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

Although there is no question that the show-up employed in this case was suggestive, there is some question as to whether the show-up was " 'so *unnecessarily* suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.' " (Emphasis added.) *Neil* v. *Biggers,* supra, 196. " 'Without

question, almost any one-to-one confrontation between a victim of crime and a person whom the police present to [the victim] as a suspect must convey the message that the police have reason to believe him [or her] guilty. . . .' *United States ex rel. Kirby* v. *Sturges,* 510 F.2d 397, 403 (7th Cir.) [cert. denied, 421 U.S. 1016, 95 S. Ct. 2424, 44 L. Ed. 2d 685 (1975)]." *State* v. *Middleton,* 170 Conn. 601, 608, 368 A.2d 66 (1976). "On the other hand, we must also consider that prompt on-the-scene confrontations tend under some circumstances to ensure accuracy. [*United States ex rel. Kirby* v. *Sturges,* supra], 404: *Bates* v. *United States,* 405 F.2d 1104, 1106 (D.C. Cir. [1968]) . . . [and that] the benefits of promptness not only aid reliability but permit a quick release of an innocent party if there is no positive identification and allow the police to resume the investigation with a minimum of delay. *Washington* v. *United States,* 334 A.2d 185 (D.C. App. [1975])." Ibid.; see *State* v. *Willin,* supra, 251–52; see also *United States* v. *Rice,* 652 F.2d 521, 528 (5th Cir. 1981); *Frank* v. *Blackburn,* 605 F.2d 910, 912 (5th Cir. 1979), cert. denied, 454 U.S. 840, 102 S. Ct. 148, 70 L. Ed. 2d 123 (1981).

In this case, the show-up occurred at the crime scene during the earlier morning hours not long after the incident and the defendant's arrest. It was important under the facts of this case for the police to determine quickly whether they had taken the right person into custody. The defendant had made no incriminating statements; in fact, he had protested his innocence, and no items of personal property readily identifiable as coming from the victims' home were found in the defendant's possession. Under these circumstances we cannot conclude that

the suggestive show-up employed in this case was impermisssibly or unnecessarily so. See *State* v. *Willin,* supra, 252; *State* v. *Middleton,* supra.

In any event, the challenged testimony was admissible under the second prong of our inquiry—reliability. Identification testimony is still admissible so long as, under all of the circumstances, the identification is reliable. *State* v. *Brown,* supra; *State* v. *Ledbetter,* supra; *State* v. *Gordon,* supra; *State* v. *Packard,* supra; *State* v. *Theriault,* supra; *State* v. *Piskorski,* supra. "The factors to be considered in determining the reliability of an identification 'include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his [or her] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.' *Manson* v. *Brathwaite,* supra, 114 (citing *Neil* v. *Biggers,* supra, 199–200)." *State* v. *Piskorski,* supra, 742.

Here, the female victim had ample opportunity to view the intruder's build, dress, voice, and diction, by which she identified the defendant; her degree of attention was high enough to give a detailed and accurate description of the intruder which allowed the police to take him into custody; she was positive about the identification after she heard the defendant speak; and the time between the incident and the confrontation was no more than two hours. The male victim never made a positive identification of the defendant, but he had the opportunity to observe and attend to those characteristics of the intruder which were similar to those

of the defendant. Moreover, the potential corrupting effect of the suggestive show-up does not seem to have occurred as neither victim claimed to be able to identify positively the defendant by his facial features which they had the opportunity to view only during the show-up.

In view of the totality of circumstances in this case, the trial court did not err in refusing to suppress the identification testimony.[1]

## II

### DESTROYED EVIDENCE

The defendant contends that the trial court erred in refusing to suppress testimony regarding physical evidence, particularly certain hairs found on

[1] In its instructions to the jury, the trial court expressly charged the jury of the considerations which they should employ in evaluating the identification testimony. The language of the instruction was as follows: "As to the issue of identification specifically, you should take into account, the following. You should consider whether or not [the victims] had the opportunity to observe those features that they have testified to here in court. You should consider the conditions under which those observations were made, the length of time the witnesses had to view the perpetrator. You should consider the related distances between the witnesses and the perpetrator. You should consider the description these witnesses gave to the police, and how soon after the description given to the police was given. The length of time between the incident and their viewing of Mr. Hamele when he was brought back to their residence by the police. The circumstances under which the viewing took place, that is the suggestibility of the procedure used, or the lack of suggestibility of the procedure used. In addition to this, you should consider all the evidence in this case as it related to whether or not Mr. Hamele was the perpetrator of these alleged crimes, keeping in mind the claims of the State that it was Mr. Hamele, and keeping in mind the position of the defendant that it was not. After considering all this evidence, if you are convinced beyond a reasonable doubt that the defendant was involved in this incident, then you would find that the State has sustained its burden of proof as to this element. On the other hand, if you are not convinced of this beyond a reasonable doubt, then your verdict must be not guilty as to all the charges."

the defendant's clothes, because this evidence was destroyed by the police prior to trial. During trial, the state presented expert testimony which indicated that some of the hairs found on the defendant were like the head hair of the female victim and that, although a positive identification could not be made, the probability of the hairs coming from another person was small. The defendant contends that the destruction of the hair samples violated his right to due process because the evidence was not available for testing by defense experts.

The facts concerning the destruction of the evidence are not seriously in dispute. The hair samples and other physical evidence later destroyed[2] were obtained by the police during their investigation on or about May 14, 1977. On July 20, 1977, the trial court granted portions of the defendant's motion for disclosure and production, including that portion which sought copies of any reports of scientific tests related to the case. In response, on August 17, 1977, the state replied that no such reports were contained in the files of the state's attorney. Furthermore, the state responded that the physical evidence in its possession was available for inspection by the defendant upon arrangement with the office of the state's attorney. More than a year later, in October or November, 1978, the evidence was destroyed by the Westport police because of the mistaken belief that the charges against the defendant were no longer pending.[3]

---

[2] Among the evidence destroyed, other than the hair samples, were the flashlight, various items of the defendant's clothing, and various soil samples.

[3] The Westport police officer in possession of the evidence destroyed it after learning and confirming that the charges against the defendant had been nolled in the Circuit Court for Norwalk. What he did

On May 21, 1979, the state filed a supplemental disclosure which contained two scientific reports. One report, dated May 18, 1977, was from the state police forensic laboratory to the Westport police. The other report, dated July 18, 1977, was from the F.B.I. laboratory to the state police laboratory and concerned evidence, including the subsequently destroyed hair, which had been forwarded to the F.B.I. The F.B.I. report indicated that some of the hairs found on the defendant's clothes were "like the [specimen] from the [female] victim and, accordingly, could have originated from her."[4] Following this disclosure, the defendant unsuccessfully moved for sanctions against the state, but he did not seek to be allowed to have his own tests performed. In fact, as the trial court found in ruling on the defendant's various motions relating to the destroyed evidence, although the defendant was aware of the tests in May, 1979, "it was only on the eve of trial in September, after learning that the tested specimens were destroyed, that [the defendant] suggested that he 'might' have wanted to perform independent tests . . . ."

In considering whether testimony concerning lost or destroyed evidence should be admitted, the trial court has to look to numerous factors including the reason for the unavailability of the evidence, the materiality of the evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, and the prejudice to the defendant caused by the unavailability of the evidence. See *State* v. *Harden*,

not know was that prior to the Circuit Court nolle the defendant had been rearrested on a bench warrant issued by the Superior Court in Bridgeport.

[4] The F.B.I. report also noted "that hairs do not contain enough individual microscopic characteristics to be positively identified as originating from a particular person to the exclusion of all others."

175 Conn. 315, 327, 398 A.2d 1169 (1978); *State* v. *Burns,* 173 Conn. 317, 325, 377 A.2d 1082 (1977).

In this case, the trial court properly concluded that the destruction of the evidence was not malicious or in bad faith. Here, unlike *State* v. *Harden,* supra, and *State* v. *Burns,* supra, the evidence might have materially aided the defense if the defense expert had been able to dispute the state's expert testimony of the similarity of the hairs. Yet, here, as in *State* v. *Harden,* supra, and *State* v. *Burns,* supra, the defendant failed to seek an independent testing of the evidence while it was available or in a timely fashion, and suggested the possibility of such testing only after he learned that the evidence had been destroyed. Moreover, the trial court's instructions to the jury in this case specifically referred to the destroyed evidence and expressly permitted the jury, if they chose to do so, to draw an adverse inference from the unavailability of the evidence.[5]

---

[5] The trial court's instructions included the following: "Now you have heard testimony in this case concerning scientific testing of certain items. Before you give credence to this testimony, you must be satisfied that these items reached the laboratory for analysis without being tampered with or changed in any substantial manner. You have also heard testimony relating to items which the police claim they seized and further testified were lost or destroyed. Before you give credence to this testimony, that these items were seized and the description given to you by the witnesses in court, etc., you must take into account those factors which I have previously related to you concerning all testimony. That is, you should take into account the demeanor of the witnesses as it bears on credibility, the substance of their testimony, the probability or lack thereof that what the witness says is true, and all other criteria relative to the credibility of a witness that I have previously mentioned to you. Ordinarily, the State need not produce all the available evidence in a case, if however, you find that there was evidence which was available only to the State, which it would naturally have produced, and such evidence was not produced, you may draw the inference—you don't have to—but you may draw the inference that such evidence was unfavorable to the State."

Under these circumstances, we conclude that the trial court did not err in refusing to exclude testimony concerning the destroyed evidence.

## III

### Impeachment By Prior Convictions

The defendant contends that the trial court erred in denying his motion in limine by which the defendant sought to "exclude all references to [the] defendant's prior criminal record" and that, as a consequence, the defendant effectively was precluded from testifying in his own defense.

"It is well established that the credibility of a witness may be impeached by proof of prior convictions of crimes for which imprisonment may be more than one year." *State* v. *Townsend,* 167 Conn. 539, 563, 356 A.2d 125, cert. denied, 423 U.S. 846, 96 S. Ct. 84, 46 L. Ed. 2d 67 (1975); see *State* v. *Shaw,* 185 Conn. 372, 383, 441 A.2d 561 (1981); General Statutes § 52-145. "The trial court's decision to deny the motion to exclude a witness' prior record when offered to attack his [or her] credibility will be upset only if the court abused its discretion. In determining whether there has been an abuse, the ultimate issue is whether the court could reasonably conclude as it did. *E. M. Loew's Enterprises, Inc.* v. *Surabian,* 146 Conn. 608, 612, 153 A.2d 463 [1959]. Every reasonable presumption in favor of the correctness of its action must be made." *State* v. *Bitting,* 162 Conn. 1, 10–11, 291 A.2d 240 (1971).

On appeal, the defendant has limited this claim of error to his 1968 convictions for breaking and entering and rape, and he concedes that the trial court

did not err in not excluding other prior convictions.[6] It is unclear from the record of the case which is before us whether this claim was so limited in the trial court. Moreover, in view of the defendant's admission that some of his criminal convictions could be used for impeachment, the decision regarding one particular conviction would appear to be harmless, even if erroneous. The defendant failed to show that he would have taken the stand, despite the admissibility of some of his criminal record, if only the 1968 convictions had been excluded. See *State* v. *Iasevoli,* 188 Conn. 325, 328, 449 A.2d 996 (1982).

In any event, we cannot say that the trial court could not reasonably conclude that all references to the defendant's criminal record should not be excluded. None of the convictions involved were too remote under the law of this state;[7] see *State* v. *Nardini,* 187 Conn. 513, 447 A.2d 396 (1982); and any possible prejudice to the defendant because of the similarity of earlier convictions to the pending charges might have been cured by instructions had the defendant chosen to testify. See *State* v. *Shaw,* supra. The trial court, therefore, did not abuse its discretion in refusing to exclude all references to the defendant's criminal record.

There is no error.

---

[6] The record before us does not make clear all of the defendant's previous convictions. The defendant acknowledges, however, that he has convictions other than the 1968 convictions which could be used for impeachment purposes.

[7] Although at the time of trial more than eleven years had passed since the defendant's 1968 convictions, it is the defendant's release date from his sentence that is relevant to the determination of remoteness. See *State* v. *Nardini,* 187 Conn. 513, 525, 447 A.2d 396 (1982).