## IN RE JUVENILE APPEAL (83–EF)*
## (10187)

SPEZIALE, C. J., PETERS, HEALEY, SHEA and GRILLO, Js.

Argued March 3—decision released June 21, 1983

*John W. Watson,* deputy assistant public defender, with whom was *Patricia H. Denuzze,* assistant public defender, for the appellant (defendant).

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 3161, the names of the parties involved in this appeal are not disclosed and the records and briefs will not be distributed to the various libraries of the state. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Supreme Court.

Reporter of Judicial Decisions

*Joseph J. Shainess,* court advocate, with whom, on the brief, was *Francis J. Carino,* chief court advocate, for the appellee (state).

ARTHUR H. HEALEY, J. After a trial, the respondent juvenile, R. B., was adjudicated delinquent after being found guilty of robbery in the third degree in violation of General Statutes § 53a-136, assault in the third degree in violation of General Statutes § 53a-61 and criminal mischief in the third degree in violation of General Statutes § 53a-117. At a subsequent hearing, the court's disposition of the case was to place him on probation until July 12, 1980.[1] Because one of the issues raised in this appeal is whether the court, *Brenneman, J.,* erred in denying a motion to suppress a pretrial identification, we will first set out the evidence presented at that hearing.

PRETRIAL INDENTIFICATION SUPPRESSION HEARING

The circumstances surrounding the court's, *Brenneman, J.,* denial of the motion to suppress identification evidence after an evidentiary hearing are the following: At the hearing the state presented two witnesses, the victim and Robert J. Cagianello, a Hart-

---

[1] At oral argument, the question arose as to whether this case was moot. This juvenile, having been found delinquent, was placed on probation which he completed without incident on August 11, 1980. At oral argument, counsel for the juvenile informed us that insofar as she was aware no proceedings seeking an erasure of the juvenile's record pursuant to Practice Book § 1062 had yet been undertaken. "Section 1062 is a bifurcated provision only part of which is self-executing." *In re Juvenile Appeal (82–AB),* 188 Conn. 557, 560, 452 A.2d 113 (1982). Even if we assume, as we do from what is before us, that he has been relieved from further accountability to the court, that circumstance, while triggering the two year period for the erasure of records under Practice Book § 1062, is not inconsistent in this case with the continued existence of a reviewable order, the adjudication of delinquency itself. See *In re Juvenile Appeal (82–AB),* supra. We regard the circumstances of this case more persuasive than those of *In re Juvenile Appeal (82–AB),* supra, for not concluding mootness.

ford police officer who investigated the incident; the defendant juvenile was not present. Officer Cagianello said that at the scene the victim said that her assailant was "Reggie" and she knew him because he had been her paper boy for approximately two years. He was not sure of the exact time of the attack although he thought it was approximately 5:45 p.m. She gave the police a physical description of her assailant and also a clothing description, saying he had a blue jacket on. While the victim identified her assailant only as Reggie, Cagianello believed the police obtained his full name from the superintendent of the building in which the victim resided. As the result of information obtained at the scene, the police put out a description; they also went to his home that night but he was not there. The next day the police picked Reggie up at a gym where they knew he played ball. At that time Cagianello said that he had a blue jacket on and that he matched the description given by the victim. They brought him to a parking lot on Tremont Street[2] where the victim viewed him from a police car, identified him as Reggie, and indicated that he was the boy who robbed her.

The victim testified that at approximately 6:15 p.m. on November 15, 1979, while walking on the driveway at 77 Oxford Street, a young man came from behind the garage and grabbed her handbag. This caused her to fall to the ground, hitting her head, and her assailant kept pulling at her handbag and dragging her on the ground for about ten feet. He said nothing. It was "dusk like" and there were flood lights from other buildings that shone in the area. As she was being pulled, she "had the presence of mind to look — to give him a good look." From her position during the pulling, she recognized him as Reggie, her paper boy for the past

[2] This location for the viewing was prearranged as the victim was afraid and did not want him brought to her home.

two years. He had collected for the paper at her door every week. The last time that she had seen him before the robbery was about a week earlier when he was collecting.

## THE TRIAL

This appeal, as previously noted, arose out of an incident that occurred in Hartford on November 15, 1979, at approximately 6 p.m., in the yard of 84 Oxford Street, just after the victim had parked her car in the garage. While walking from the garage toward the driveway between two buildings in order to get to her apartment at 77 Oxford Street, she was attacked by a single assailant with whom she struggled as he tried to seize her pocketbook. She fell to the ground, was hit on the head and was injured. She was treated right after the attack at a Hartford hospital. The same night she told police investigating the incident that she recognized her assailant as Reggie (the respondent juvenile), who had been her newspaper boy for the past two years.[3] The police went to the juvenile's home that night but he was not there. The next day police officers located him and brought him to a prearranged location at a parking lot on Tremont Street where another police officer was present with the victim. She immediately identified him as her assailant.

At the trial, the victim again identified the juvenile as the one who robbed and attacked her on November 15, 1979. The police officer who took her to the "show-up" on Tremont Street on November 16, 1979, also testified to her identification at that time. The matter of the time surrounding the November 15 attack was developed at trial. The defense was alibi and the

---

[3] At oral argument, his counsel, in response to an inquiry by the court, stated that Reggie was still the victim's newspaper boy at the time of the attack on November 15, 1979.

juvenile's aunt, sister and brother, with whom he lived, were witnesses. Ms. Litto, the acting director of a recreational center, which was "diagonally across the street" from the juvenile's home, also testified. The hospital record concerning the victim's visit and treatment[4] there on November 15, 1979, was introduced as an exhibit by the state.[5] The time stamp on the hospital record, which the trial court understood as indicating the time of the victim's arrival there, was 6:18 p.m., which relates to that portion of the typewritten entry on the hospital records which recites: "Pt states approx 25 min ago on Oxford St. Hartford, Ct. she was assaulted when a purse snatcher knocked her down. . . ." The defendant himself testified, but only as to his height and weight as that affected the victim's evidence on those two matters.

In an oral decision from the bench the trial court *Kline, J.,* found the juvenile guilty on the three counts of the petition. In doing so the court was obviously impressed by the "very positive identification"[6] the victim made the night of the attack, pointing out that "knowing him as well as she did, it's hard to see how she could misidentify him, she told the police exactly who it was after it occurred." As to the "show-up,"

---

[4] At the trial the victim testified that she had "blood all over my face," "had four stitches over my left eye" and that she "couldn't walk for two days because I had a sprained leg." She also said that she still had a scar on her left cheek. In addition, her glasses which she was wearing were broken and she lost forty dollars and certain papers when her pocketbook was taken from her.

[5] The hospital records came into evidence without limitation or objection at which time the transcript discloses the following:

"Mr. Shainess: At this point Your Honor, I would like to put in evidence the medical records from Saint Francis Hospital, I've showed them to Mr. Lougee already.

"Mr. Lougee: No objection.

"The Court: They may be marked State's Exhibit A."

[6] At another point in its statement the court referred to "that very, very positive description by the victim . . . ."

the court said: "They [the police] were at the house that very night[. It] wasn't the identification the next day that made any difference, one way or another." The strength of this identification overcame the deficiencies in the victim's testimony as to the height and weight of her assailant and the time of the attack. The court stated that it could not rely on this latter testimony. It is obvious, both from the finding of guilty and this statement of the court, that the alibi evidence was not as credible[7] as claimed and, therefore, the court concluded that the state had satisfied its full burden of proof.

On his appeal, the juvenile claims that the court erred: (1) in refusing to suppress the identification testimony; (2) in considering incompetent hearsay evidence; and (3) in finding facts on critical issues unsupported by evidence.

We turn first to the claim that the court erred in refusing to suppress the identification testimony. The juvenile argues that there was ample evidence at the hearing on the motion to suppress to show that the victim's identification would have been "highly suspect" under the circumstances even without the impermissibly suggestive "show-up." He maintains that inasmuch as virtually the sole issue in the trial court was the reliability of his identification by the victim as her assailant, the state must be found not to have sustained its burden of proof on the reliability of the victim's identification both in and out of court. He argues that his due process rights were violated in the identification procedures permitted in this case. Included in the attack on her identification is the assertion that no supporting testimony or physical evidence "to cor-

---

[7] The court said: "Testimony of people who have, uh . . . are related to the victim are as always a (inaudible) suspect anyway, it always have [sic] the taint of the relationship."

roborate her identification—e.g. fingerprints, shoe marks, weapon, clothing, handbag, or other fruits of the crime—was offered to tie the respondent to the crime." On the other hand, the state, recognizing the suggestive nature of "show-ups," argues that the victim's pretrial identification was reliable under the surrounding circumstances. It also claims that the "show-up" "was merely a confirmation, not a basis for initial identification." The state insists that the pretrial "show-up" did not taint the victim's in-court identification. In arguing that it sustained its burden of proof, the state urges that the motion to suppress was properly denied and that there was no error in admitting the in-court identification. We agree with the state.

" 'In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was [impermissibly and] unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the "totality of the circumstances." [Citations omitted.]' *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980)." *State* v. *Hamele,* 188 Conn. 372, 376, 449 A.2d 1020 (1982); see *Manson* v. *Brathwaite,* 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *Neil* v. *Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); *State* v. *Brown,* 187 Conn. 602, 614–15, 447 A.2d 734 (1982).

In applying this test, we first must determine whether the identification procedure used by the police at the "show-up" on November 16, 1979, was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Stovall* v. *Denno,* 388 U.S. 293,

301–302, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967); *Neil* v. *Biggers,* supra, 196; *State* v. *Hamele,* supra, 376; *State* v. *Middleton,* 170 Conn. 601, 608, 368 A.2d 66 (1976). At oral argument, the state conceded that the "show-up" confrontation was "suggestive," but not "unnecessarily suggestive." "Although one man confrontations do not per se constitute a denial of due process; *Neil* v. *Biggers,* supra; *Simmons* v. *United States,* 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968); *Stovall* v. *Denno,* 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967); *State* v. *Middleton,* 170 Conn. 601, 606, 368 A.2d 66 (1976); *State* v. *Carnegie,* 158 Conn. 264, 269, 259 A.2d 628, cert. denied, 396 U.S. 992, 90 S. Ct. 488, 24 L. Ed. 2d 455 (1969); this court has stated that '[w]ithout question, almost any one-to-one confrontation between a victim of crime and a person whom the police present to him as a suspect must convey the message that the police have reason to believe him guilty . . . .' *State* v. *Middleton,* supra, 608, quoting with approval *United States ex rel. Kirby* v. *Sturges,* 510 F.2d 397, 403 (7th Cir. 1975); see *State* v. *Willin,* [177 Conn. 248, 251, 413 A.2d 829 (1979)]." *State* v. *Theriault,* 182 Conn. 366, 372, 438 A.2d 432 (1980); see *State* v. *Maturo,* 188 Conn. 591, 595–96, 452 A.2d 642 (1982).

Even were we to assume that the "show-up" procedure in this case was unnecessarily suggestive, the defendant still could not prevail because the identification itself was nevertheless reliable under the totality of the circumstances. "[R]eliability is the linchpin in determining the admissibility of identification evidence. *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *State* v. *Ledbetter,* [185 Conn. 607, 614, 441 A.2d 595 (1981)]; *State* v. *Theriault,* [182 Conn. 366, 373, 438 A.2d 432 (1980)]; *State* v. *Gold,* 180 Conn. 619, 655, 431 A.2d 501, cert.

denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980)."[8] *State* v. *Doolittle,* 189 Conn. 183, 192, 455 A.2d 843 (1983); see *State* v. *Gordon,* 185 Conn. 402, 415, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982). " 'The factors to be considered in determining the reliability of an identification "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his [or her] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson* v. *Brathwaite,* supra, 114 (citing *Neil* v. *Biggers,* supra, 199–200).' *State* v. *Piskorski,* [177 Conn. 677, 742, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979)]." *State* v. *Brown,* 187 Conn. 602, 616, 447 A.2d 734 (1982).

The reliability of the victim's identification of the defendant as her assailant is disclosed by the circumstances, most of which we have already set out. We would also note that the victim had a good and sufficient opportunity to view her assailant at the time of the assault at close range and with adequate lighting; these factors enhance reliability. See *United States* v. *Yanishefsky,* 500 F.2d 1327, 1330–31 (2d Cir. 1974); *Willin* v. *Ajello,* 496 F. Sup. 804, 808 (D. Conn. 1980); *State* v. *Willin,* 177 Conn. 248, 254n, 413 A.2d 829 (1979). The victim in this case, rather than yielding, kept struggling to keep her handbag. She had the

---

[8] "This is so in determining the admissibility of both the pretrial and the in-court identifications. *State* v. *Piskorski,* 177 Conn. 677, 742, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979), citing *Manson* v. *Brathwaite,* 432 U.S. 98, 106–107 n.9, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)." *State* v. *Doolittle,* 189 Conn. 183, 192n, 455 A.2d 843 (1983).

presence of mind "to give him a good look." This spills over into her degree of attention. It has been stated "that the victim of [a] crime is apt to be a more reliable source of identification than is a mere spectator to the incident." *Willin* v. *Ajello,* supra, 808. This proposition has been said to be so because the personal impact of the criminal episode is likely to leave a victim with "a particularly vivid recollection of events" along with the thought that a victim's "special emotional stake . . . make[s] him especially 'motivated to make a careful observation of the perpetrator.' " *Willin* v. *Ajello,* supra, quoting *United States ex rel. Phipps* v. *Follette,* 428 F.2d 912, 915 (2d Cir.), cert. denied, 400 U.S. 908, 91 S. Ct. 151, 27 L. Ed. 2d 146 (1970). During the suppression hearing in this case, the court, *Brenneman, J.,* aptly observed: "The degree of attention she gave him, it seems to me a woman with presence of mind to hang on to her purse a couple of minutes while being dragged is being rather intent on observation."

On the accuracy of her prior description of the assailant, the victim, shortly after the attack, told the police that he was Reggie, her newsboy for two years. She also told them that he was about fifteen or sixteen years old, had a short haircut and was wearing a blue jacket.[9] There is no evidence that the victim was uncertain or vague at the time of the "show-up" identification. Cagianello, who was with her at that time, testified that she said that the boy at the "show-up" was Reggie, the same boy that robbed her.[10] He also said that on

---

[9] Although there was such evidence at the trial, the transcript of the suppression hearing does not disclose any evidence on the height and weight of the assailant. Her testimony at the trial on the assailant's height and weight was in conflict with that of the defendant.

[10] At the trial, police officer Berardino, who was also present at the "show-up" said that at that time the victim "immediately" identified the defendant "as the one who had assaulted and robbed her."

both nights the defendant wore the same blue jacket. Such identification supports its reliability.

At the suppression hearing, Cagianello said that the "show-up" was "within 24 hours" although it apparently took place in the early evening of November 16. "Lapse of time between the crime and the confrontation is also important; the longer the interval, the greater the dangers that the initial image will have dimmed and that the second image will play a significant role. Also, a long interval between the initial observation and the trial coupled with an improper confrontation a comparatively short time before the witness appears in court enhances the danger that he may be relying on his most recent encounter." *United States ex rel. Phipps* v. *Follette,* supra. Under the circumstances, we think the elapsed time here was reasonable. See *Manson* v. *Brathwaite,* supra, 116 (two days). The elapsed time was hardly such as to be a "seriously negative factor" in asserting the validity of the identification process. See *Neil* v. *Biggers,* supra, 201 (where identification held valid even though there was a lapse of seven months between the rape and the confrontation). Under the totality of circumstances, the victim's "show-up" identification of the defendant as her assailant was sufficiently reliable to be admitted under relevant constitutional standards; *Manson* v. *Brathwaite,* supra; *Neil* v. *Biggers,* supra; and the motion to suppress was properly denied.

The "totality of the circumstances" test also is the test of admissibility of the in-court identification. Thus, here too it must be determined, under such circumstances, whether the identification is sufficiently reliable despite the suggestiveness of a "show-up." Applying the guidelines of such cases as *Neil* v. *Biggers,* supra, and *Manson* v. *Brathwaite,* supra, the analysis concerning the victim's in-court identification is com-

parable to the "show-up" identification. Two matters, however, we would note. First, the lapse of time between the crimes and the in-court identification was approximately six months. Under the facts of this case this does not constitute even "a somewhat negative factor." *Neil* v. *Biggers,* supra, 201; see *United States* v. *Williams,* 596 F.2d 44 (2d Cir.), cert. denied, 442 U.S. 946, 99 S. Ct. 2893, 61 L. Ed. 2d 317 (1979) (in-court identification admitted 32 months after the crime). In addition, the reliability of the victim's identification was greatly enhanced by the certainty with which it was made at every stage in the identification process. See *United States* v. *Sanchez,* 603 F.2d 381, 386 (2d Cir. 1979). There was no violation of the defendant's due process rights in admitting the in-court identification; the "show-up" did not taint her in-court identification.

In making his other two claims of error, the defendant argues that to counter the victim's identification, he offered the testimony of Ms. Litto and three members of his family, which, taken together, is "wholly inconsistent" with his guilt. He maintains that the trial court resolved this conflict by relying in its decision on the victim's "very, very positive description." He further asserts that in reaching this result, the trial court created its own "theory" of the case (1) by using "incompetent" hearsay evidence,[11] and (2) in making findings on critical issues of fact which are unsupported by the evidence. In rejecting this theory, we do not agree with either of those claims.

We must reject the defendant's claim because a fair reading of the transcript indicates that the court did not rely on incompetent hearsay and facts unsupported

---

[11] With reference to the defendant's claim of hearsay as to the hospital record, we have already noted that no objection of any sort was made to the admission of the hospital record in the trial court.

by the evidence in order to support its finding of guilty. After the court had made its remarks about the evidence, the court stated: "If the victim weren't so positive, as I said earlier, in her identification, I would say that I would find the defendant not guilty." These remarks indicate that the trial court acknowledged that it could not have found the defendant guilty beyond a reasonable doubt premised upon the "theory" the defendant attributes to the trial court. Instead, immediately following these qualifying remarks, the court stated: "However, in light of the very positive identification, her relationship with the young man over the past two years, and knowing him as well as she did, it's hard to see how she could misidentify him, she told the police exactly who it was after it occurred. They were at the house that very night [. It] wasn't the identification the next day that made any difference one way or another. I [am] going to have to find him guilty of the three counts." It is clear that based upon the strength of the victim's identification, the court found the defendant guilty and chose not to credit the defendant's alibi evidence. This it was entitled to do, and we cannot conclude that the court's decision was clearly erroneous. Practice Book § 3060D.

There is no error.

In this opinion the other judges concurred.