## STATE OF CONNECTICUT *v.* GLEN A. MULLINGS (12914)

SHEA, DANNEHY, CALLAHAN, QUINN and MENT, Js.

Argued October 10, 1986—decision released January 6, 1987

*Joette Katz,* public defender, with whom was *Robert Sweeney,* for the appellant (defendant).

*Susan C. Marks,* deputy assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Mary Galvin,* assistant state's attorney, for the appellee (state).

DANNEHY, J. The defendant, Glen A. Mullings, was found guilty by a jury of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4).[1] After denying motions for a judgment of acquittal at the close of the state's case and for a new trial at the close of all the evidence, the trial court sentenced the defendant to imprisonment for a term of ten years. On appeal, the defendant contends that the trial court erred: (1) in refusing to strike the testimony of a certain witness; (2) in its instructions regarding circumstantial evidence; (3) in allowing certain cross-examination of the defendant's alibi witnesses; and (4) in refusing to give an adverse inference instruction concerning the unavailability of evidence. We find no error.

After the jury was selected, the trial court heard evidence on the defendant's motion in limine to exclude the testimony of Charles Bryant, the victim of the crime and the key witness for the state.[2] After conducting

---

[1] "[General Statutes] Sec. 53a-134. ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . . "

[2] The defendant's motion was entitled "Motion in Limine Re: Taped Statement Made by Charles Bryant to the New Haven Police Department." In

a hearing outside of the jury's presence, the court denied the defendant's motion. The evidence received by the court at the hearing will be stated subsequently when we consider that issue. This opinion will commence with a summary of the pertinent evidence during the state's case in chief.

The evidence most favorable to the state indicates that on December 22, 1984, Bryant was working at the Arco AM-PM Minimart in New Haven. He testified that he was alone in the store when the defendant entered between 2:30 and 3 a.m. and asked for a person called "Rerun." Bryant told the defendant that he had not seen Rerun. At the same time the defendant began walking toward an office in the rear of the store. As he reached the office he inquired whether the Chungs, who owned the Minimart, were on the premises. The defendant returned from the office to the counter where Bryant was standing. He put his hand in his pocket, withdrew a gun, replaced the gun in his pocket and said, "This is a robbery." The defendant demanded and was given the money from the cash register and a change box that was hidden under the counter. He ordered Bryant not to push the "panic button" and to move away from the counter. Bryant complied with both orders. The defendant stated that he knew where the panic button was and also knew the "angle of the [surveillance] camera." While these events were transpiring, Bryant had a good opportunity to view the defendant. He later described the robber as a black male, between five feet eight inches and six feet tall, about twenty-eight to thirty years old, and of average build. The man was beardless, with a "Jeri curl" hairstyle, and was wearing a black velvet jacket and brown trousers. According to Bryant, the defendant went into

it, the defendant requests, inter alia, that the testimony of Bryant be stricken pursuant to Practice Book § 755. Because the motion was filed before Bryant testified, we will refer to it as a motion to exclude Bryant's testimony.

the office to disconnect the surveillance camera, returned to the counter, and asked for a box of Newport cigarettes. He assured Bryant that he would not hurt him and stated that he committed the robbery to get back at the Chungs. After the defendant left the store Bryant looked out and saw him driving away in a large, dark-colored automobile.

Bryant reported the robbery to the police and several uniformed officers of the New Haven police department promptly responded. At the scene Bryant furnished the investigating officers with a detailed description of the man who had robbed him, including the man's height, weight, build, age, hair length and clothing. Bryant was immediately taken to police headquarters to view some photographs. The police showed Bryant a group of photographs but Bryant made no identification. Thereafter Bryant was shown a second array of photographs but again he made no identification.

Within two weeks after the robbery, Bryant again saw the defendant while working the night shift at the Minimart. He testified that one evening he heard someone rattling the Minimart door, which was locked. According to Bryant, as he approached the door he saw the defendant standing outside. The defendant took one look at Bryant, turned and ran. Bryant watched the defendant drive away in a dark-colored Cadillac automobile.

On January 14, 1985, Bryant was asked to come to police headquarters to look at a third array of photographs. At this time, he selected the defendant's photograph and said that he was "98 percent sure" that the defendant was the robber. In court, Bryant positively identified the defendant as the man he had personally observed on the morning of the robbery. During Bryant's testimony, the jury also saw a videotape of

the robbery up until the time the robber turned off the machine. The videotape corroborated Bryant's version of the events. After Bryant finished his testimony, he stood side by side with the defendant to allow the jury to compare their sizes because Bryant had testified that the robber was shorter than he.

Hsick Chung, the owner of the Minimart, testified that he had employed the defendant on the night shift for approximately one month in the summer of 1984. When the defendant left Chung's employ he was an angry man, apparently because of an argument he had had with Chung's wife. Chung testified that the defendant knew the location of the surveillance system and the panic button in the store. He also knew where the cash box was concealed.

The defendant was apprehended on March 1, 1985, and at the time of his arrest was in or near his 1970 Cadillac automobile. A package of Newport cigarettes was found in the car and the defendant told the police that he smoked that brand of cigarettes. The defendant also told the police that he had worked at the Minimart and that he knew the location of the panic button and the video camera. Although the defendant had not been informed that Bryant was the Minimart clerk on duty during the night of the robbery, he told the police that the store clerk wore glasses and therefore could have been mistaken about his identification.

## I

The defendant's first contention on appeal is that his motion to exclude Bryant's testimony was erroneously denied. This motion was filed prior to trial and was based on the alleged prejudicial effect of the loss of a statement Bryant had given to the police. The defendant claimed that the statement Bryant made to the police after the robbery had been deliberately destroyed and, therefore, the interests of justice required exclud-

ing Bryant's testimony from the record. See Practice Book § 755; *State* v. *Myers,* 193 Conn. 457, 479 A.2d 199 (1984). After hearing the evidence on the motion, the court denied it.[3]

The court's ruling must be examined in light of the testimony adduced at the pretrial hearing on the defendant's motion in limine. The preliminary testimony revealed facts similar to those recounted above. Bryant testified first, relating his account of the armed robbery of the Minimart as it had occurred early in the morning of December 22, 1984. Bryant also stated that shortly after the robbery when police officers arrived at the store, he recapitulated the robbery and gave them a description of the man who had robbed him. One officer, Andrew Gambardella, took notes while Bryant was interviewed, and read back portions of the notes to Bryant to ensure their accuracy. Bryant then went to the police station to view an array of photographs. While at the station, Bryant also recounted the robbery incident and described the robber to Detective Donna Amato, who tape-recorded his statements.

Amato testified that the recording could not be produced because the tape had been erased pursuant to routine police procedure. She also revealed that a transcript had been made from the recording but that it had been misplaced. The defendant then requested that the court order a search for the misplaced transcript. Upon learning that such a search would take three to four weeks, the court denied the request. The court found that there had been no "nefarious destruction" of the transcript and decided to treat the transcript as if it had been lost.

---

[3] The defendant's motion requested that the charges against the defendant be dismissed pursuant to Practice Book § 747 (3) or, in the alternative, that the testimony of Bryant be stricken. On appeal, the defendant only alleges error in the refusal of the court to grant the second request.

Bryant indicated that the description of the robber supplied to Amato did not differ from the description he gave at the hearing. In addition, Bryant told of a prior out-of-court identification he had made of the defendant by selecting his photograph from a group of photographs after rejecting other photographic arrays in which no picture of the defendant appeared.

It is the destruction of the tape recording of Bryant's statement to Amato and the unavailability of its transcription about which the defendant complains. The state concedes that both the transcript of Bryant's statement to Amato and the tape recording of that statement are statements subject to disclosure under Practice Book §§ 749 through 755. Our Practice Book makes clear that one sanction for nondisclosure of discoverable material is to strike the testimony of the witness whose statement is being withheld. Practice Book § 755.[4]

This court has considered similar claims involving the loss of a witness's tape-recorded statement in several recent decisions. See *State* v. *Milum,* 197 Conn. 602, 500 A.2d 555 (1985); *State* v. *Myers,* supra; *State* v. *Shaw,* 185 Conn. 372, 441 A.2d 561 (1981), cert denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982). In those cases we employed a balancing test whereby the imposition of sanctions for nondisclosure " 'depends in large measure upon the extent of the Government's culpability for failure to make disclosable material available to the defense, on the one hand, weighed against the amount of prejudice to the defense which resulted,

---

[4] Practice Book § 755, titled "Failure to Comply with Order," provides: "If the prosecuting authority elects not to comply with an order of the judicial authority to deliver to the defendant any statement of a witness who has testified or such portion thereof as the judicial authority may direct, the judicial authority shall strike from the record the testimony of the witness, and the trial shall proceed unless the judicial authority, in his discretion, upon motion of the defendant, determines that the interests of justice require that a mistrial be declared."

on the other.' " *State* v. *Shaw,* supra, 386, quoting *United States* v. *Miranda,* 526 F.2d 1319, 1329 (2d Cir. 1975), cert. denied, 429 U.S. 821, 97 S. Ct. 69, 50 L. Ed. 2d 82 (1976); see also *State* v. *Milum,* supra, 617; *State* v. *Myers,* supra, 467. Since there exists no constitutional right of access to the statements of a witness for the prosecution, the burden of showing prejudice rests with the defendant. *State* v. *Vessichio,* 197 Conn. 644, 662, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986); *State* v. *Milum,* supra, 616.

The defendant in the present case maintains that the destruction of the tape of Bryant's statement was done deliberately and with bad faith, and therefore sanctions should be imposed against the state regardless of whether prejudice to the defendant can be shown. The defendant bases his bad faith claim on the fact that the New Haven police department's "routine destruction" of the tape violated our edicts in *Shaw* and *Myers,* condemning such routine procedures. These cases were decided prior to the investigation of the robbery in the instant case.

The trial court recognized that central to the issue regarding the missing tape and transcript was the question of whether the police department acted in bad faith. After hearing testimony from several witnesses, the court concluded that Bryant's statement to Amato had not been destroyed maliciously. Although we have repeatedly emphasized our disapproval of the routine destruction of discoverable material and recognize that the police had at least constructive notice of this policy,[5]

---

[5] We use the phrase "at least constructive notice" because Amato testified that she personally was unaware of any policy directives in the New Haven police department in December of 1984 directing the police not to erase tapes of witness statements. We have already stated, however, that our decision in *State* v. *Myers,* 193 Conn. 457, 479 A.2d 199 (1984), was published before this investigation took place. Therefore, the police department had at least constructive notice of our concern regarding the routine erasure of tapes.

we nonetheless agree with the trial court that the police department's actions in this case were not conducted in bad faith.

The investigation of the robbery took place in December, 1984, six months after our decision in *Myers,* but prior to our rulings in *Milum* and *Vessichio.* In *State* v. *Myers,* supra, 465–66, the witness' statement had been taped but no transcript had been made. The tape was erased and the only existing record of the statement was in the form of a police report paraphrasing what the witness had said. Id., 468. In chastising the police department for erasing the tape we explained that the purpose behind Practice Book §§ 749 through 755, and that of the Jencks Act[6] was to ensure that a witness could be impeached only by statements which could fairly be said to be his own. *State* v. *Myers,* supra. We stated that this purpose is frustrated when a government agent "summarizes a witness' statement in his report and destroys the verbatim statement." Id.

The state contends and we agree that our holding in *Myers* could reasonably have been interpreted as excusing the erasure of tapes as long as a verbatim transcript was preserved. In *State* v. *Milum,* supra, 614–17, however, we reiterated our disapproval of the destruction of discoverable material even though in that case a transcript had been made from the tape which subsequently was erased. *State* v. *Milum,* supra, 614–17. The state contends that since *Milum* was decided after the investigation of the robbery in this case, the erasure of the tape after a verbatim transcript had been made was consistent with a reasonable, though in hindsight erroneous, interpretation of *Myers.* Thus, the state argues, the police department's actions

---

[6] The Jencks Act, 18 U.S.C. § 3500, was the model for §§ 748 through 755 of our Practice Book. See *State* v. *Myers,* 193 Conn. 457, 468 n.6, 479 A.2d 199 (1984).

should not be viewed as having been done in bad faith. We agree with the state's logic.

In the absence of bad faith, we have continued to adhere to the balancing test set forth in *Shaw* and *Myers* in determining whether a witness' testimony should be stricken. *State* v. *Milum,* supra, 617. As stated above, that test weighs the extent of the government's culpability for nondisclosure against the amount of prejudice to the defendant. *State* v. *Myers,* supra, 467; *State* v. *Shaw,* supra, 386. We recognize that this approach gives broad discretion to the trial court. *State* v. *Shaw,* supra. The erasure of the tape by the police, while not in bad faith, was certainly not excusable. This conclusion, however, does not end our inquiry. We must now determine whether the defendant demonstrated some degree of prejudice from the failure to disclose the witness' statement so as to justify the imposition of sanctions against the state.

The defendant in the present case knew before trial that Bryant's statement could not be produced because the tape had been erased and the transcript misplaced. He adapted his trial strategy accordingly by using the state's inability to produce the statement in an attempt to impeach the in-court identification by Bryant. Moreover, the notes taken by Gambardella shortly after the robbery were available to the defendant during cross-examination of Bryant. Aside from a minor discrepancy concerning the type of gun carried by the robber,[7] the cross-examination of Bryant did not reveal any inconsistencies between his trial testimony, his recollection of the contents of the lost statement, and his statement to Gambardella. Finally, we note that the jury viewed

---

[7] There was some confusion at trial as to the kind of gun used by the robber. Bryant testified that he told the officers at the scene of the crime that the gun was a handgun with a "square back." Apparently, the police report reflected that the gun was a revolver. Bryant, who was unfamiliar with guns, could not recall whether he had used the word revolver or whether the officer had used the word after Bryant described the weapon.

the videotape of the incident and observed Bryant's in-court identification of the defendant. Under the circumstances of this case, the defendant suffered little if any prejudice from the loss of the statement to Amato. We find no error in the trial court's denial of the defendant's motion to strike.

## II

The defendant next contends that the judge's instructions to the jury regarding circumstantial evidence unconstitutionally diluted the state's burden of proving the essential elements of the crime beyond a reasonable doubt.

Robbery may be proven by circumstantial evidence and the inferences drawn therefrom. The state presented circumstantial as well as direct evidence that the defendant was guilty of the crime charged. During its charge on circumstantial evidence, the court stated that the jurors could rely on circumstantial evidence, which would allow them to consider evidence of facts and to infer from those facts the existence of another fact or set of facts. The court went on to explain that such an inference could be made provided "one, that the facts from which you're asked to draw the inference has itself been proven beyond a reasonable doubt; and two, that the inference asked to be drawn is not only logical and reasonable, but it is strong enough so that you could find that *it is more probable than not that the fact to be inferred is true.*" (Emphasis added.)

It is well settled that the state must prove all essential elements of a crime beyond a reasonable doubt in order to obtain a conviction. *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State* v. *Reddick,* 197 Conn. 115, 131, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986). The defendant argues that the "more probable than not" portion of the court's instruction was likely

to have misled the jury into concluding that facts inferred from circumstantial evidence, including those pertaining to the issue of identity, could be found by a preponderance of the evidence. We do not agree.

On three prior occasions, we have examined "more probable than not" instructions on circumstantial evidence. In order to evaluate the instruction given in the present case, it is necessary briefly to review those earlier decisions. In *State* v. *Reddick,* supra, 132, we held that instructions nearly identical to those given here could not reasonably have misled the jury because the court repeatedly instructed the jury that the state was required to prove every element of the offense beyond a reasonable doubt. In *State* v. *Rodgers,* 198 Conn. 53, 56–59, 502 A.2d 360 (1985), however, we found reversible error, holding that an instruction similar to that given in the present case impermissibly diluted the requirement that the state establish guilt beyond a reasonable doubt.

The relationship between these two decisions was extensively discussed in *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S.     , 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), another case involving circumstantial evidence instructions. See also *State* v. *Farrar,* 7 Conn. App. 149, 508 A.2d 49, cert. denied, 200 Conn. 805, 512 A.2d 229 (1986). We noted in *State* v. *Whelan,* supra, 757, that the principal distinction between *Reddick* and *Rodgers* was that the element of intent was in dispute in the latter case but not in the former. We emphasized that when the principal factual issue is intent, which is characteristically proven by circumstantial evidence, we will closely scrutinize the court's instructions regarding the use of circumstantial evidence as proof of that essential element. *State* v. *Whelan,* supra. On the other hand, " 'where the principal factual issue is identity, which is not classically dependent upon circumstantial evidence for its proof, the trial

court's instructions may be read as a whole to determine whether it is reasonably possible that the jury was misled by an erroneous explanation regarding the use of circumstantial evidence.' '' Id., quoting *State* v. *Farrar,* supra, 155–56.

Unlike *Whelan* and *Rodgers,* the primary issue before the jury in this case involved the identity of the robber, as the defendant offered an alibi defense. The challenged portion of the charge was delivered to the jury only once, during the court's general instructions pertaining to the burden of proof and not, as in *Rodgers,* during its specific instructions on the elements of the crime. Moreover, on at least fourteen occasions, the court instructed the jury that it was the state's burden to prove the elements of the crime charged beyond a reasonable doubt, and several times the jury was told that the defendant is presumed innocent until proven guilty.

We also note that substantial direct evidence was presented by the state to establish that the defendant was the perpetrator of the robbery. Bryant made a positive in-court identification of the defendant and his testimony revealed that he had had an ample opportunity to observe the robber before, during and after the robbery. When the trial judge instructed the jury on the identity issue, he clearly stated that the state has the burden of proving identity beyond a reasonable doubt.[8]

---

[8] The trial court instructed the jury on the identity issue as follows: "A definite essential element of this crime, however, is identification. The state has the burden of proving identity beyond a reasonable doubt. It's not essential that the witness himself be free from doubt as to the correctness of his statement. You, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict him. If you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you must find the defendant not guilty. . . . I emphasize to you that the burden of proof on the state extends to every element of the crime charged. And this specifically includes the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime with which he stands charged."

Having examined the charge as a whole, we conclude that it was not reasonably possible that the isolated use of the phrase "more probable than not" confused or misled the jury with regard to the state's heavy burden of proof. *State* v. *Mason,* 186 Conn. 574, 585–86, 442 A.2d 1335 (1982).

## III

The defendant's third claim on appeal involves certain questions asked by the prosecutor during the cross-examination of two defense witnesses. At trial, the defendant presented the testimony of two alibi witnesses, Paul Dickson and Walter Flegler. Both testified that they were good friends of the defendant and that during the time when the robbery occurred they, together with the defendant, were frequenting two local bars. During cross-examination, the witnesses stated that they had learned of the defendant's arrest shortly after it had occurred. The prosecutor questioned the witnesses about whether they had gone to the police or other authorities as soon as they learned of the defendant's arrest to explain that the defendant had been with them on the night of the robbery. The defendant objected to the inquiries on relevancy grounds.[9] The trial court overruled the objections and the questions were allowed. The answers revealed that neither witness had reported the information to the authorities when they learned of their friend's arrest.

We find no merit to the defendant's claim that the trial court should not have allowed the state to question the alibi witnesses about their pretrial silence. We

---

[9] The defendant also objected to the questions regarding Dickson's pretrial silence on the ground that an adequate foundation had not been laid that Dickson was aware he possessed exculpatory information. The court sustained the objection and the state was permitted to conduct a voir dire to determine when Dickson first learned of the charges against the defendant. The court then ruled that a proper foundation had been laid and the state continued to cross-examine Dickson in the jury's presence.

recently considered this issue in *State* v. *Ghere,* 201 Conn. 289, 513 A.2d 1226 (1986). In ruling that questions to alibi witnesses regarding pretrial silence may be relevant, we stated that, "[a]lthough we do not believe that an alibi witness has a duty to report an alibi story to the police or, for that matter, to any other person, a witness in many instances naturally may be expected to convey such information, especially when the witness is friendly with the accused. Failure of the witness to do so would, under these circumstances, constitute grounds for impeachment." Id., 304. We see no basis for questioning this ruling.

The defendant also asserts that the prosecutor's questions to the alibi witnesses deprived him of due process, a fair trial and the right to present a defense. We note that the defendant phrased his objection at trial on relevancy grounds and not on constitutional grounds. In order for us to review the claim on appeal, we must find that it implicates the deprivation of a fundamental constitutional right and a fair trial. *State* v. *Evans,* 165 Conn. 61, 69, 327 A.2d 576 (1973).

Our review of the defendant's claim convinces us that the cross-examination of the alibi witnesses in this case did not implicate a fundamental constitutional right. We have never recognized any fundamental right of a defendant not to have his witnesses discredited. Instead, we have acknowledged that an alibi can be "the last desperate resort of the guilty and may be easily concocted. . . ." *State* v. *Cianflone,* 98 Conn. 454, 466, 120 A. 347 (1923). Recently, we explained that vigorous cross-examination of an alibi witness is a necessity. *State* v. *Briggs,* 179 Conn. 328, 334, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980). In short, the defendant's constitutional claim is but another instance of a defendant placing "a constitutional tag on a nonconstitutional claim."

*State* v. *Vitale,* 197 Conn. 396, 403, 497 A.2d 956 (1985); *State* v. *Gooch,* 186 Conn. 17, 18, 438 A.2d 867 (1982); see also *State* v. *Ghere,* supra, 301 n.9.

## IV

The defendant's final claim on appeal is that the trial court erred in refusing to instruct the jury that it was allowed to draw an "adverse inference" against the state for its destruction of the tape and loss of the transcript. Both parties acknowledge that our jurisdiction has little authority relating to the propriety of an adverse inference instruction where evidence has been lost or destroyed.

In his request to charge, the defendant referred to *State* v. *Hamele,* 188 Conn. 372, 449 A.2d 1020 (1982), which is the only case in which we have discussed an adverse inference instruction in the context of destroyed evidence.[10] In *State* v. *Hamele,* supra, 379–80, the trial court refused to suppress testimony regarding certain physical evidence which had been destroyed before trial and thus was unavailable for testing by defense experts. We found no error in the trial court's refusal to suppress the testimony, pointing out that the court had not found any bad faith destruction and that the defendant had not sought testing of the evidence during the year when it was available. We also noted that an adverse inference instruction had been given to the jury. Id.

The trial judge in the present case distinguished *Hamele* in denying the defendant's request to charge. He explained that there, the evidence destroyed was

[10] *State* v. *Morrill,* 197 Conn. 507, 498 A.2d 76 (1985), also dealt with the destruction of evidence. There, our only reference to an adverse inference instruction was as follows: "Although the defendant also criticizes the lack of any instruction to the jury concerning this evidence, such as that given in *State* v. *Hamele,* [188 Conn. 372, 382 n.5, 449 A.2d 1020 (1982)], it does not appear that he made any request for such an instruction." *State* v. *Morrill,* supra, 550.

physical evidence (which had been found on the defendant), whereas the present case involved state's evidence in testimonial form. The statement destroyed was given by and to individuals who testified at trial and whose credibility could be weighed by the jury. Moreover, the court pointed out that it had not found any malicious intent to destroy the tape or misplace the transcript, nor had it found any potential inconsistencies between the taped statement and the testimony given.

We hold that the trial judge's refusal to provide the jury with an adverse inference instruction was proper under the circumstances of this case. Our brief reference to the adverse inference instruction given in *Hamele* should not be interpreted as requiring that such an instruction be given in every case involving destroyed evidence. We affirmed the trial court's actions in that case on the basis of numerous factors, not simply the fact that the instruction was given to the jury. See *State* v. *Hamele,* supra, 381–83.

The trial judge in the present case correctly noted that *Hamele* involved the destruction of physical evidence. Depending on the circumstances surrounding the destruction of physical evidence and the materiality of that evidence, an adverse inference instruction may be appropriate in some instances. In the present case, however, the material destroyed was in the form of a statement made to and by witnesses who testified at trial. As the trial judge noted, the jury was in a position to weigh the credibility of those witnesses. Moreover, the court found that the unavailability of Bryant's statement was not due to bad faith actions on the part of the police. The trial court did not err in refusing to provide the jury with an adverse inference instruction.

There is no error.

In this opinion the other justices concurred.