STATE OF CONNECTICUT *v.* JEFFREY MITCHELL

STATE OF CONNECTICUT *v.* HOWARD TINNEY, JR.
(3840)

DUPONT, C. J., BORDEN and BIELUCH, Js.

Argued January 10—decision released April 15, 1986

48

*Michael E. O'Hare,* deputy assistant state's attorney, with whom, on the brief, were *Gerard Esposito,* deputy assistant state's attorney, and *John M. Massameno,* assistant state's attorney, for the appellant (state).

*Milo J. Altschuler,* with whom was *Christine M. Ellis,* for the appellees (defendants).

BORDEN, J. The state appeals, with the permission of the trial court, from the judgments of the court dismissing the information against each defendant, Jeffrey Mitchell and Howard Tinney, Jr. The state had filed two-count informations against each defendant, charging them with sexual assault in the second degree, in violation of General Statutes § 53a-71 (a) (1), and risk of injury to or impairing the morals of a child, in violation of General Statutes § 53-21. The principal issue in these combined appeals involves the nature and length of an investigative detention of the defendants, as a result of which the victim identified them. We find error, and remand the cases for further proceedings.

Each defendant filed the following identical motions: a motion to suppress items seized from their persons and from Tinney's automobile; a motion to suppress both pretrial and in-court identifications made of the defendants by the victim; and a motion to dismiss the information. The motions to suppress the seized items were based on claims that the items were seized without a warrant and without probable cause, that the items were seized illegally pursuant to a search warrant which was executed after the seizure, and that the affidavits supporting the warrant were flawed under the rule of *Franks* v. *Delaware,* 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). The motions to sup-

press the identifications were based on claims that the police lacked probable cause to take the defendants into custody and bring them to the victim for an identification, and that the ensuing show-up was unnecessarily suggestive and thus tainted a subsequent out-of-court photographic identification and any in-court identification. The motions to dismiss were based on claims that the defendants were arrested without probable cause, that the two charges constitute double jeopardy, and that there was insufficient reason or evidence to continue the prosecutions. After a lengthy evidentiary hearing, the court granted all of the defendants' motions.

In its oral memorandum of decision the court made only limited factual findings and legal conclusions. We, therefore, must look to all the evidence produced in support of its decision. State v. Martin, 2 Conn. App. 605, 614, 482 A.2d 70 (1984), cert. denied, 195 Conn. 802, 488 A.2d 457, cert. denied, 472 U.S. 1009, 105 S. Ct. 2706, 86 L. Ed. 2d 721 (1985). That evidence, those findings and the conclusions on those claims are as follows.

At about 11 p.m. on Sunday, July 22, 1984, the Ansonia police department received a complaint of a sexual assault of the victim, who was a fourteen year old caucasian girl. Officer Michael J. Kennedy went to the home of the victim's grandmother in Derby and spoke to the victim. She gave him general details of the incident, including a claim that the assault took place in the parking lot of the Bradlees department store in Derby. Kennedy was then joined by officers Mark Ptak and Peter Zaskiewicz of the Ansonia police department, who took the victim to the Griffin Hospital in Derby, arriving there at about 11:25 p.m.

Kennedy's written report of the incident indicated that the victim identified the car of the assailants as a Datsun. Zaskiewicz testified that en route to the

hospital the victim told him that the car was a white, bullet-shaped sportscar with white wheels, which she identified as a Mazda. She described the assailants to him as two black men in their early twenties, one taller than the other. When they arrived at the hospital, Zaskiewicz spoke to Kennedy and gave him the information which he had received from the victim on the trip to the hospital.

Meanwhile, because the victim had indicated that the scene of the assault was in Derby, the Ansonia officers contacted the Derby police department. Officers Joseph Iacuone and Eugene Mascolo of the Derby police department met at the hospital at about 11:30 p.m. and interviewed the victim. She told Iacuone and Mascolo that, as she was walking through the Bradlees parking lot, two men got out of a white, torpedo-shaped sports car with shiny wheels, which she thought was a Mazda, and chased her to the end of the lot, where they caught her and assaulted her near the adjacent Baskin-Robbins ice cream store. She described her assailants as two black males in their early twenties, between 5 feet 8 inches and 6 feet tall, weighing between 180 pounds and 200 pounds, and having short hair. She described one of the men as slightly taller than the other man, with a slender but muscular build, wearing maroon sweat pants and a white tee shirt and sneakers. She described the other man as slightly smaller but muscular, and wearing jeans and a tee shirt. She indicated that one of the men was named "Mike."

Iacuone completed this interview of the victim and telephoned the descriptions of the assailants and the car to officer Robert Proto, who was then the desk officer of the Derby police department. At midnight, Proto was relieved of his desk duties and was assigned, together with officer Maureen Menillo, to assist in the investigation of the alleged sexual assault on the victim. They arrived at the hospital at about 12:15 a.m.

At the hospital, Zaskiewicz told Proto that he knew that the defendant, Howard Tinney, Jr., drove a white Mazda RX-7 with silver wheels. Zaskiewicz gave Proto Tinney's address on Scotland Road in Ansonia.

Proto and Mascolo went to the area of the Tinney residence, arriving there at about 2 a.m. The white Mazda was not there. They parked near the residence and waited. A few minutes later a white Mazda, generally fitting the physical description of the vehicle given by the victim, drove up followed by a white Thunderbird.

Two black males exited the white Mazda. One was about 5 feet 10 inches tall and was wearing dark blue sweat pants and a tee shirt; the other, about 6 feet tall, was wearing jeans, a shirt and sneakers. Proto was aware that the victim had said that the taller of the two assailants had been wearing maroon sweat pants and that the shorter of the two had been wearing jeans. Mascolo recognized the shorter man as the defendant Tinney. The taller man was the defendant Jeffrey Mitchell. The defendants entered the white Thunderbird, which was being operated by a woman, and the Thunderbird began to drive away. Proto pulled the Thunderbird over, radioed Ansonia for assistance, and advised the occupants that he was investigating a sexual assault. Zaskiewicz soon joined Proto and Mascolo.

Zaskiewicz talked with the defendants for about ten minutes. The defendants denied any involvement in the sexual assault, and stated that they had spent the evening in Waterbury, and then in a bar in Ansonia. The defendants were told that they would have to go with the officers to the hospital for a field identification. The defendants entered Proto's police vehicle and were driven to the hospital. The drive took about four minutes. They arrived at the hospital between 2:15 a.m. and 2:30 a.m.

When they arrived at the hospital the victim was being treated by a physician. The defendants were required to wait in the police car for about twenty-five minutes, during which time Tinney asked if he could call his father and was told by Proto that "as soon as we finish you can do anything you want . . . ."

When the victim's treatment was completed, the defendants were brought into the foyer of the emergency room. The area was well lit. The victim, seated in a wheelchair, was wheeled by the defendants twice, and stopped directly in front of them the second time. She was ten to twenty feet from them. The victim stated that she was positive that Tinney was one of the men who had assaulted her and that she was pretty sure that Mitchell was the other.[1] At that point, the defendants were formally arrested.

The victim was then taken to Scotland Road, where she identified Tinney's vehicle[2] as the one driven by her assailants. Her identification of the vehicle was aided by her recognition of a helmet and a wicker basket in the rear of the vehicle, which she saw through the windows and which she recalled as being in the vehicle at the time of the assault. At about 3 a.m., Zaskiewicz was dispatched to maintain surveillance on the car, which he did until it was towed to the Ansonia police department at about 6:30 a.m.

From Scotland Road, the victim was taken by the police to the Bradlees parking lot, where she pointed

---

[1] Prior to the identification of the defendants, the victim had been asked to identify three other men at the hospital. The first two were young black men whom the police stopped on the street near the hospital and brought into the emergency room for a possible identification. The victim knew these two men and did not identify them as her assailants. The third was a black man who had come to the emergency room for treatment. The victim also knew him, and did not identify him as one of her assailants.

[2] Although the police knew that the vehicle was registered to Tinney's mother, they considered it to be his car. Both the state and the defendants agree that in reality it was the car of the defendant Tinney.

out the place of the alleged assault. From there she was taken to the Derby police department, where she was asked to give the police a written statement.

The victim gave Menillo an oral statement, which was reduced to typewritten form, detailing a sexual assault near Bradlees in Derby. Before signing the statement, however, the victim asked to talk to her mother. After doing so, the victim told Menillo that the statement was not true.[3] She then gave and signed a written statement detailing a sexual assault in Tinney's car at Nolan Field in Ansonia.

The victim's written signed statement, which was given at 4:10 a.m. on July 23, 1984, stated that she left her grandmother's house at 8:30 p.m. the previous evening and went to Olson Drive in Ansonia, where she saw a friend, Kevin Johnson. There were two black males in a white sports car that looked like a Mazda. They asked her if she wanted to go for a ride. She knew that they were named Jeff and Mike. They drove her to Nolan Field, where they gave her cocaine, forcibly assaulted her sexually, and threatened her if she told anyone about the episode. She described the driver of the car as taller than she, husky and as having a mustache. She described the passenger as having a roundish face and as wearing jeans. This written statement

---

[3] This statement ends as follows: " 'Note'—At this point [the victim] asked to speak to her mother alone. Her mother was present while the statement was being taken. After conferring with her mother [the victim] told [officer Menillo] that the incident did not happen in Derby but in Ansonia in the car in Nolan Field.

"I have read or have had the above statement read to me and it is not true." This disclaimer was then signed by the victim and her mother.

At the hearing, the victim explained that she initially falsified the location and details of the assault because she did not want her mother to know that she had been in the Olson Drive area of Ansonia, which was an area mainly populated by black people, and that she did not want her mother to know that she had entered the car voluntarily.

also acknowledged that when the Ansonia police took her to the hospital she told them that the incident took place in Derby.

When Tinney's vehicle was towed away by the Ansonia police department, in the rear passenger area there were a wicker basket, a large gym bag containing football equipment, and a football helmet with a team decal on its side. At about 9:30 a.m. that morning, a warrant was issued to search Tinney's car. The return and inventory executed pursuant to the warrant indicate, inter alia, glassine bags and cellophane packages with white powder traces, other materials commonly associated with cocaine use, and a "cigarette lighter phone with residue."

About one week after the incident, the victim was shown a photographic array, from which she identified photographs of the defendants as her assailants. The defendants do not claim that this array was suggestive. They urge its suppression only on the ground that it was tainted by the hospital identification.

At the hearing on the defendants' motions, the victim testified as follows: On Sunday, July 22, 1984, she was visiting her grandmother in the town of Derby. At about 9 p.m., she arrived at Olson Drive in the town of Ansonia, where she met Kevin Johnson, who introduced her to two black males in a white sports car. She got into the car with them, and they drove her to Nolan Field in Ansonia where, for the next two and one-half hours, she was with the men in the front seat of the car. The interior of the car was illuminated from time to time by a small light, which looked like a telephone, and she had the opportunity to observe them and their clothing. She testified that she told the officers that one man wore sweat pants of a blue or maroonish color, but that it was dark out, indicating her uncertainty as

to the color; the other man wore jeans and a tee shirt. One man, the driver, had a mustache.

On the basis of the evidence produced at the hearing, the trial court made the following relevant factual findings: The victim's first story was an admitted lie. The victim first identified the car involved as a Datsun, not a Mazda. She called it a Mazda after Zaskiewicz "supplied certain information to her." The victim was confused about who wore the dark blue sweat pants. They were not maroon, although she had first said they were maroon. She said that the driver had them on. She changed her identification of the color to blue because she was probably told by the police that they were blue. The cigarette lighter phone, the wicker basket and the helmet could be seen from outside the car, but the court questioned why the victim did not mention the football gear which was very visible. The victim lied to the police about the site of the assault for five and one-half hours, and had the defendants mixed as to size, facial characteristics and clothing. Although she claimed to have been with them for two and one-half hours, she could not describe their shirts.

The court also pointed out the following factors. The search warrant for the car did not mention the victim's lie, the fact that one of the men was known to her as "Mike," that she initially thought the car was a Datsun and that she did not make a "positive I.D." of the defendant Mitchell. The court also found that the victim confused the football helmet with a motorcycle helmet, even though the football helmet had a readily identifiable team decal on it. There was no medical evidence to corroborate the victim's statement to the police that she had had intercourse or had used drugs. The court expressed amazement that Kevin Johnson, who allegedly had introduced the victim to the defendants, was not brought in to testify. The court also noted

the lack of evidence to corroborate the victim's testimony that Tinney's vehicle was at Nolan Field.

The court found that the defendants were seized when they were stopped on Scotland Road and taken to the hospital. The court equated a seizure with an arrest, and concluded that the requisite probable cause for an arrest was lacking. The court also found that a one on one show-up is "unnecessarily suggestive," that Mitchell had no standing to suppress any items found in Tinney's car because of the lack of a possessory or other interest in the car, and that Tinney did have standing to suppress the evidence found in the car. The court found that the car was seized when it was towed away, and that it was searched without a warrant.

The court found the victim "not to be credible." The court also found that the identification of the defendants made by the victim at the hospital was unnecessarily suggestive, and that the state had not established that the subsequent photographic identification and "the one she made in Court could be wholly independent of the one on one identification made at the Hospital." The court then granted the motion to suppress all of the identifications of both defendants by the victim, granted the motions to suppress the seized evidence as to both defendants, and granted the motions to dismiss the informations as to both defendants with prejudice. The court summarized the basis for its ruling as being "due to two things basically; improper police conduct and the complainant's total lack of credibility." This appeal followed.

I

THE HOSPITAL IDENTIFICATION

The state does not challenge on appeal the trial court's finding that the defendants were "seized," in

constitutional parlance, when they were stopped on Scotland Road and taken to the hospital. See *State* v. *Martin,* supra, 611 (seizure takes place when, in view of all circumstances, a reasonable person would have believed that he was not free to leave). The state argues first, however, that the police had probable cause to arrest the defendants at that time, and that, therefore, the show-up at the hospital was not suppressible. The state next argues that, even if probable cause was lacking for an arrest, the seizure of the defendants was valid because it was based on reasonable and articulable suspicion.

We do not reach the issue of whether the police had probable cause to arrest the defendants on Scotland Road. We conclude that the police made a valid investigative detention of the defendants when they stopped them in the Thunderbird on Scotland Road, that taking them to the hospital was within permissible limits of that detention, and that the show-up at the hospital was, while suggestive, not impermissibly so under the circumstances of this case.

## A

### THE SEIZURE OF THE DEFENDANTS

We first consider the validity of the stop of the defendants while in the Thunderbird on Scotland Road. "[U]nder some circumstances a seizure of an automobile and its occupants may permissibly take place on less than probable cause, such as when there is an investigative stop based on reasonable and articulable suspicion." *State* v. *Martin,* supra, 612. The test for determining whether "a seizure should be measured by probable cause or by the less exacting standard of reasonable suspicion is objective, not subjective. . . . That is, the court should, in evaluating a search and seizure, look not to the subjective state of mind of the

officer performing the search and seizure but to whether 'the circumstances, viewed objectively, justify that action.' " (Citation omitted.) Id.

The test of reasonable and articulable suspicion is also objective. It is whether the collective information available to all the police personnel at that time; *United States* v. *Cortez,* 449 U.S. 411, 417–18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981), reh. denied, 455 U.S. 1008, 102 S. Ct. 1648, 71 L. Ed. 2d 877 (1982); gives " 'the detaining officers . . . a particularized and objective basis for suspecting the particular person[s] stopped of criminal activity.' " *State* v. *Scully,* 195 Conn. 668, 674, 490 A.2d 984 (1985), quoting *United States* v. *Cortez,* supra. Although *Scully* has language suggesting that investigative stops are limited to situations in which the officer suspects ongoing or imminent, as opposed to completed, criminal activity; *State* v. *Scully,* supra, 674; that limitation has been specifically rejected as a matter of fourth amendment jurisprudence. "[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in . . . a completed felony, then [an investigative] stop may be made to investigate that suspicion." *United States* v. *Hensley,* 469 U.S. 221, 105 S. Ct. 675, 681, 83 L. Ed. 2d 604 (1985).[4]

It is clear that, viewed objectively, the stop of the defendants on Scotland Road was not an arrest, which would have required probable cause, but was an investigative stop requiring only reasonable and articulable suspicion. The defendants were not placed under any formal physical restraint, such as handcuffs. They were not searched or interrogated. They were not taken from

---

[4] Although the defendants purport to rely on both the Connecticut and the federal constitutions in their motions, they offer no separate analysis suggesting different treatment between the two. We therefore see no need to undertake such an analysis. See *State* v. *Cosby,* 6 Conn. App. 164, 166, 504 A.2d 1071 (1986).

a private dwelling to a police station or other place involving a coercive atmosphere. Cf. *United States* v. *Sharpe,* 470 U.S. 675, 105 S. Ct. 1568, 1574 n.4, 84 L. Ed. 2d 605 (1985); *Dunaway* v. *New York,* 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979). The manifest purpose of the detention was to maintain a temporary status quo in order to confirm or dispel the suspicion aroused by the facts that the defendants and their car fit the general description given by the victim. See *State* v. *McMullen,* 2 Conn. App. 537, 540, 480 A.2d 594 (1984).

We also conclude that the information available to the police at that point, viewed objectively, gave them reasonable suspicion to stop the defendants. The victim had described her assailants as two black males in their early twenties, between 5 feet 8 inches and 6 feet tall, weighing between 180 and 200 pounds. She described one of them as slightly taller than the other, with a slender but muscular build wearing maroon sweat pants, a white tee shirt and sneakers. She described the shorter of the two as muscular, wearing jeans and a tee shirt. She described their car as a white, torpedo-shaped car with shiny wheels, and identified its make as a Datsun, then as a Mazda. When the defendants were stopped on Scotland Road, the car in which they had arrived fit the general description given by the victim. The defendants were two young black men, one taller than the other. Tinney was wearing dark sweat pants and a white tee shirt. Mitchell was wearing jeans, a tee shirt and sneakers. Thus, they fit the general description of her assailants given by the victim.

The fact that there were some discrepancies between the information given to the police by the victim and the actual appearance of the defendants does not, in and of itself, vitiate the reasonable suspicion created by the similarities. Reasonable suspicion has " 'never required precise correlation between a victim's descrip-

tion and the actual appearance of a suspect.' " *District of Columbia* v. *M.M.*, 407 A.2d 698, 701 (D.C. App. 1979). The standard, as we have noted, is objective: " 'would the facts available to the officer at the moment of the seizure . . . "warrant a man of reasonable caution in the belief" that the action taken was appropriate.' " *State* v. *Januszewski*, 182 Conn. 142, 148, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981). The match between, on the one hand, the victim's descriptions of her assailants and of their car, and, on the other hand, the actual appearance of the defendants and of the car, was sufficient to warrant the officers' making an investigative stop of the defendants on Scotland Road.

This does not end our inquiry, however. Having concluded that the investigative stop was " 'justified at its inception' "; *United States* v. *Sharpe*, supra, 1573, quoting *Terry* v. *Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); we next must consider " 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.' " *United States* v. *Sharpe*, supra.

"The precise limits on investigatory stops to investigate past criminal activity are more difficult to define [than the limits on investigative stops to investigate imminent or ongoing criminal activity]. The proper way to identify the limits is to apply the same test already used to identify the proper bounds of intrusions that further investigations of imminent or ongoing crimes. That test, which is grounded in the standard of reasonableness embodied in the Fourth Amendment, balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *United States* v. *Hensley*, supra, 680. Determination of the reasonableness of the scope of an investigative detention "depends upon a fact-bound examination of

the particular circumstances of the particular governmental intrusion on the personal security of a suspect." *State* v. *Braxton,* 196 Conn. 685, 689, 495 A.2d 273 (1985). Applying this balancing test, we conclude that the scope of the investigative stop of the defendants, including transporting them to the hospital for the identification by the victim, was reasonable under all of the circumstances.

First, the length of the duration of the stop, namely, thirty-nine minutes from the initial stop to the ultimate identification by the victim at the hospital, was reasonable under all of the circumstances. There is no specific time limit on investigative stops. *United States* v. *Sharpe,* supra, 1575. While brevity of the intrusion is an important factor in evaluating the nature of the intrusion on the defendant's fourth amendment interests, the United States Supreme Court "ha[s] emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." Id.

"In assessing whether a detention is too long in duration to be justified as an investigative stop, [it is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. See *Michigan* v. *Summers,* 452 U.S. [692, 701 n.14, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981), quoting 3 W. LaFave, Search and Seizure (1978) § 9.2, p. 40; see also *United States* v. *Place,* 462 U.S. 696, 709, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983); *Florida* v. *Royer,* 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)]. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *United States* v. *Sharpe,* supra, 1575–76. In *Sharpe,* the court upheld a twenty

minute detention of the defendant as reasonable, where the police acted diligently and the defendant's actions contributed to the added delay. In *United States* v. *Place,* 462 U.S. 696, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983), the court held that a detention of the defendant's luggage lasting for ninety minutes was unreasonable, where the police did not act diligently to minimize the detention.

The thirty-nine minute length of the defendants' detention, while longer than the twenty minutes upheld in *Sharpe,* was reasonable under all the circumstances. In this connection, we note that appoximately ten minutes of that period was on Scotland Road, while the defendants were seated in their friend's car. Thus, that intrusion on their privacy and liberty was minimal. The drive to the hospital took but four minutes. The major portion of the detention was the twenty-five minute wait at the hospital while the victim completed her treatment. That portion of the delay, therefore, cannot be attributable to any lack of diligence on the part of the police. It was due to a neutral factor over which they had no control, and there is no indication in this record that they delayed at all once the treatment of the victim was completed. The police were acting diligently to pursue a means of investigation, namely, display of the defendants to the victim while her memory was still fresh, which was likely to confirm or dispel their suspicion quickly, and this means of investigation obviously required the reasonable detention of the defendants. See *United States* v. *Richards,* 500 F.2d 1025 (9th Cir. 1974), cert. denied, 420 U.S. 924, 95 S. Ct. 1118, 43 L. Ed. 2d 393 (1975) (one hour detention held to be reasonable).

Second, the nature, seriousness and recency of the crimes involved in these cases suggest the need for a limited but continued detention of the defendants so that, if probable cause soon developed, it would be desir-

able to arrest the defendants and subject them and their car to a search. The nature of a sexual assault is such that physical evidence, which otherwise may be available shortly after the assault, may disappear with the passage of a short period of time. Evidence such as body fluids or hair, which might be detectable in the assailant's clothing or at the scene of the assault, can easily become unavailable with the passage of time. A legitimate reason for continuing custody, to be weighed along with other factors, exists when "the suspected crime is recent enough that if probable cause soon develops it would be desirable to arrest the suspect and subject him to a search . . . ." 3 LaFave, Search and Seizure (1986 Sup.) § 9.2, p. 19.

Third, the transportation of the defendants the short distance to the hospital was permissible under all of the circumstances. It did not vitiate the investigative nature of the stop that the defendants were moved from one place of temporary detention to another. *United States* v. *Vanichromanee*, 742 F.2d 340, 345 (7th Cir. 1984). Relocation of a temporarily detained suspect is permissible incident to an investigative stop if it does not make the stop unreasonably more intrusive. Id. An important factor in evaluating such a relocation is whether it is to a more police-oriented institutional setting, such as a police station or interrogation room. Id. Here, the relocation was to a neutral setting required by the circumstances, namely, the outside of the hospital emergency room. Furthermore, the distance of the relocation, taking but four minutes by car, was relatively short. "The value of [a prompt] identification, while the victim's memory is still fresh, justified . . . the short transportation of [the defendants] to the [hospital]." *Wilkerson* v. *United States*, 427 A.2d 923, 926 (D.C. App. 1981); see 3 LaFave, supra, pp. 42–44, and p. 26 (1986 Sup.).

## B

### THE IDENTIFICATION OF THE DEFENDANTS

The trial court ruled that Connecticut case law is that "identification by one on one show-up is unnecessarily suggestive" and that, therefore, the identification of the defendants by the victim at the hospital was suppressible. It also concluded, on the basis of this ruling and of its finding of the victim "not to be credible," that any subsequent out-of-court and in-court identifications of the defendants by the victim could not be wholly independent of that first identification, and that those subsequent identifications must be suppressed as well. We agree with the state that the court erred in its analysis of the identification issue and in the result it reached.

First, our law is clear that while a one-on-one show-up is inherently suggestive, it does not automatically follow that such a show-up is *impermissibly* suggestive. See, e.g., *State* v. *Hamele,* 188 Conn. 372, 376–77, 449 A.2d 1020 (1982); *State* v. *Nelson,* 4 Conn. App. 514, 516–17, 495 A.2d 298 (1985). A critical factor in determining whether a show-up is impermissibly suggestive is that " 'the benefits of promptness not only aid reliability but permit a quick release of an innocent party if there is no positive identification and allow the police to resume the investigation with a minimum of delay.' " *State* v. *Hamele,* supra, 377. Here, as in *Hamele,* the show-up occurred during the early morning hours shortly after the incident and the seizure of the defendants. It was important for the police to determine promptly whether the defendants were involved. The defendants had protested their innocence, and there were no readily identifiable items of the victim in their possession. Id. Under these circumstances, the show-up at the hospital cannot be deemed to be impermissibly suggestive. Id., 377–78.

Second, even if an identification procedure is found to be impermissibly suggestive, the identification is admissible if it is found to be nevertheless reliable based on examination of the totality of the circumstances. Id., 376. In ruling on this second prong of the identification analysis, namely reliability, the trial court's function, however, is *not* to determine whether the identification made by the witness should be believed. That is the function of the ultimate factfinder in the case. The trial court's function in employing a reliability analysis is to determine only whether the identification was made under circumstances carrying sufficient objective *indicia of reliability* to permit the identification into evidence, and thus to permit the ultimate factfinder to make the decision of whether to believe it. When those objective indicia of reliability are missing or are sufficiently in doubt, the impermissible suggestiveness of the identification cannot be overcome by those indicia, and the factfinder must then be insulated from the suggestiveness of the identification. The trial court's function, then, in performing the reliability analysis is limited; it is to make a preliminary determination of whether those objective indicia of reliability are sufficiently present to enable the ultimate question of the accuracy of the identification to go to the factfinder.

This view of the trial court's proper function derives from a careful reading of the fountainhead case on the reliability factor. *Manson* v. *Brathwaite,* 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). In *Manson,* the United States Supreme Court held that, even if an out-of-court identification procedure was impermissibly suggestive, the identification is admissible if it was reliable based on the totality of the circumstances. Id., 116. "[R]eliability is the linchpin in determining the admissibility of identification testimony . . . ." Id., 114. The factors weighing on reliability, "to be weighed [against]

the corrupting effect of the suggestive identification itself"; id.; include the opportunity of the victim to view the criminal, the degree of attention of the victim, the accuracy of the victim's prior description, the level of certainty of the identification, and the time lapse between the crime and identification. Id.

A careful reading of that case makes clear that this is a question of admissibility of evidence, not of whether the identification is to be believed. Under *Manson,* the totality of circumstances test "permits the *admission* of the confrontation evidence if, despite the suggestive aspect, the out-of-court identification *possesses certain features of reliability."* (Emphasis added.) Id., 110. The test of admissibility is the protection of "an *evidentiary* interest . . . ." (Emphasis added.) Id., 113. Short of the point at which the identification procedure produces " 'a very substantial likelihood of irreparable misidentification' "; id., 116; the identification "evidence *is for the jury to weigh* . . . for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (Emphasis added.) Id., 116. The holding of the case "correctly relies only on appropriate *indicia of the reliability of the identification itself."* (Emphasis added.) Id., 118 (Stevens, J., concurring). This understanding of *Manson* v. *Brathwaite,* supra, is buttressed by its numerous progeny in our Supreme Court and in this court. See, e.g., *State* v. *Amarillo,* 198 Conn. 285, 294, 503 A.2d 146 (1986) (under the totality of the circumstances, the identification was sufficiently reliable to warrant its admission into evidence); *State* v. *Perez,* 198 Conn. 68, 77, 502 A.2d 368 (1985); *State* v. *Soriano,* 2 Conn. App. 127, 132, 476 A.2d 633 (1984). In this case, the evidence at the hearing was that the victim was in the automobile with her unmasked sexual assailants for two and

one-half hours, with occasional light illuminating them from the phone cigarette lighter. Thus, her opportunity to view them and the degree of her attention were amply indicated. *State* v. *Amarillo,* supra (crime of sexual assault offers greater opportunity for observation of perpetrators than any other crime). Her description of them, both as to their physical features and clothes, while inaccurate in some respects, was certainly close enough to the mark to permit a jury to assess its ultimate correctness. She positively identified one of the defendants and was "pretty sure" about the other. The time between the crime and the identification was but a few hours. Moreover, the confrontation process itself took place in a well-lit neutral setting, and there was no evidence of prompting by the police. We cannot but conclude that the identification at the hospital possessed sufficient indicia of reliability so as to permit the identification evidence ultimately to be weighed by a jury.

This conclusion disposes of the defendants' claim that the subsequent photographic identification, which the defendants do not claim was suggestively conducted, was properly suppressed. Since the initial identification procedure was not impermissibly suggestive and the identification was sufficiently reliable, there is no need to inquire whether it tainted any subsequent photographic identification. *State* v. *Findlay,* 198 Conn. 328, 336–37, 502 A.2d 921 (1986); *State* v. *Nelson,* supra, 517. That subsequent identification is not suppressible. Nor, therefore, is any subsequent in-court identification, which the trial court also suppressed.[5]

---

[5] Despite the trial court's finding that the state did not prove "that the identification that [the victim] made in Court could be wholly independent of the one-on-one identification made at the hospital," the record is clear that the victim was not permitted, at the defendants' insistence, to make any in-court identification of the defendant at the hearing in the trial court. When the state attempted to have her do so, the defendants objected, claim-

Thus, the court erred, not only in suppressing the identification of the defendants at the hospital, but in suppressing any subsequent identifications.

In this connection, we address the negative findings of the trial court regarding the victim's credibility in this case. The trial court specifically found the victim not to be credible. It also expressed amazement at the absence of Kevin Johnson as a witness to testify about the victim's initial contact with the defendants, and at the absence of any medical or scientific evidence to corroborate the victim's statements to the police about the sexual assault on her by the defendants and about the defendants' giving her drugs. In assessing her credibility about these matters in the context of the proceedings before it, the trial court exceeded its proper bounds. The motions before the court did not call upon the trial court to make this particular credibility determination.

The motions to suppress the identification asserted that the defendants were in custody on less than probable cause, that the show-up was unnecessarily suggestive, and that the later photographic identification and any in-court identification were tainted by the illegal show-up. The factual and legal issues raised by these claims did not concern the ultimate question of whether the victim was telling the truth when she described, either to the police on the evening in question or at the hearing on the motions, the assault on her and the defendants' part in that assault. The question of her credibility about these matters is a question which the ultimate factfinder, jury or court, will have to answer. The factual and legal issues before the court on this motion involved the question of whether the police, confronted with the information given to them by the vic-

---

ing that "[w]hether or not the gentlemen in question are identifiable by [the victim] is not relevant to these proceedings at all." In response, the state withdrew the question, and the court said, "[i]t may be withdrawn."

tim and the information obtained through their own efforts, acted reasonably and within applicable constitutional restraints. This question does not turn on the victim's credibility.

Thus, the trial court also erred by focusing on the absence of Kevin Johnson as a witness and on the lack of medical or other evidence to corroborate the victim's statements. The state can hardly be taken to task for failing to produce, at this hearing on the constitutional admissibility of evidence, material which is properly reserved for the trial on the issue of guilt. The same reasoning applies to the disposition of the defendants' motions to suppress the evidence obtained as a result of the search of their persons and of Tinney's car, discussed more fully below. Since the issue on that motion was whether the car was seized with probable cause, the focus should not have been on the ultimate question of whether the victim was telling the truth, but on whether the police acted reasonably on the basis of the information furnished by the victim and the other facts disclosed to them during their investigation of her complaint.

## II

### THE SEARCH AND SEIZURE OF THE DEFENDANTS' PERSONS AND OF TINNEY'S CAR

### A

#### SEARCH OF THE DEFENDANTS' PERSONS

The defendants' motions to suppress seized items sought suppression of two kinds of evidence: evidence seized from their persons; and evidence seized from Tinney's car. We briefly dispose of the motion to suppress insofar as it relates to evidence seized from their persons. The basis of the defendants' argument is that their persons were illegally seized, and that any search of them was without a warrant and not incident to a

lawful arrest. Although the record is unclear as to what this evidence consists of, the defendants suggest in their brief that they refer to the "mug shots" obtained of the defendants as a result of their arrest, their fingerprints, and their clothing. The short answer to the defendants' argument is that we have already concluded that their seizure on Scotland Road and their identification by the victim at the hospital were not illegal. Therefore, once the victim identified them at the hospital, probable cause to arrest them clearly existed. Thus, their arrests were valid, as were any searches of their persons that followed. See *State* v. *Magnotti*, 198 Conn. 209, 214, 502 A.2d 404 (1985).

## B

### MITCHELL'S CHALLENGE TO SEARCH OF TINNEY'S CAR

We next consider Mitchell's motion to suppress the evidence seized from Tinney's car. Although the trial court specifically found that Mitchell had no possessory or legal interest in the car, and although the undisputed evidence was that his entire connection to the car was as a passenger, the court nonetheless granted the motion as to him. This was error. Mitchell had no reasonable expectation of privacy in Tinney's car and could not, therefore, object to the introduction of evidence gathered as a result of a search of the car. *Rakas* v. *Illinois*, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), reh. denied, 439 U.S. 1122, 99 S. Ct. 1035, 59 L. Ed. 2d 83 (1979); *State* v. *Daay*, 5 Conn. App. 496, 498, 500 A.2d 248 (1985).

## C

### TINNEY'S CHALLENGE TO SEARCH OF HIS CAR

We next consider Tinney's motion to suppress the items seized from his car on the bases that the items were seized (1) without probable cause, (2) without a warrant, and (3) pursuant to a seizure which preceded

the subsequently issued warrant, and, further, that the affidavit underlying the search warrant was intentionally or recklessly false. We agree with the state that the court erred in granting this motion.

Once the victim positively identified the car as the one in which her assailants were sitting before they chased her and assaulted her, the police had probable cause to believe that the car contained evidence of the crime. They could certainly infer that, after the assault, the defendants returned to the car, and that traces of physical evidence linking them to the assault would be in the car. When the victim identified the car it was parked on Scotland Road. The police knew that although it was considered to be the car of the defendant Tinney, it was registered in his mother's name. Thus, it certainly retained the elements of mobility and lesser expectation of privacy which the courts have identified as relieving the police of the obligation to secure a warrant to seize and search an automobile which they have probable cause to believe contains evidence of a crime. *State* v. *Johnson,* 183 Conn. 148, 154, 438 A.2d 851 (1981). Once the police lawfully seized the vehicle on the basis of probable cause, they had the authority to search it without the necessity of securing a warrant. Id.; see also *United States* v. *Johns,* 469 U.S. 478, 105 S. Ct. 881, 83 L. Ed. 2d 890 (1985); *United States* v. *Ross,* 456 U.S. 798, 825, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982) (if probable cause justifies search of lawfully stopped vehicle, it justifies search of entire vehicle); *Chambers* v. *Maroney,* 399 U.S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419, reh. denied, 400 U.S. 856, 91 S. Ct. 23, 27 L. Ed. 2d 94 (1970).

Furthermore, to the extent that Tinney relies on the argument that the police the next morning obtained an invalid search warrant for the car and searched the car pursuant to that warrant, that reliance is unavailing here. That argument is premised on the fact that

the supporting affidavit, which tracked the victim's second, signed statement describing the incident as it occurred in the car at Nolan Field, did not disclose that the victim had earlier given a different and false version to the police. Thus, Tinney argues, the warrant was invalid under *Franks* v. *Delaware,* 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). We disagree.

*Franks* requires, as a precondition to obtaining an evidentiary hearing challenging the truthfulness of an affidavit supporting a search warrant, that the defendant make "a substantial *preliminary showing* that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . [that] the allegedly false statement is necessary to the finding of probable cause . . . ." (Emphasis added.) Id., 155–56; *State* v. *Piland,* 2 Conn. App. 513, 514–15, 480 A.2d 588 (1984). The allegations of falsehood must be "more than conclusory"; *Franks* v. *Delaware,* supra, 171; they must be accompanied by an offer of proof pointing specifically to the part of the affidavit claimed to be false, and they must also be accompanied by a supporting statement of reasons. The offer of proof itself must be by way of affidavits or otherwise reliable statements of witnesses, or their absence satisfactorily explained. Finally, the falsity must be that of the search warrant affiant, not of a nongovernmental informant. Id. In this case, the state objected, at the hearing on the motion to suppress the items seized from the car, that Tinney had made no such preliminary showing. On appeal, Tinney conceded at oral argument, as indeed he must in view of this record, that he made no such preliminary showing as required by *Franks.* It was error, therefore, for the court to use *Franks* as a basis for granting Tinney's motion to suppress the evidence seized from his car.

## III

### THE GRANTING OF THE DEFENDANTS' MOTIONS TO DISMISS

#### A

##### EVIDENTIARY SUFFICIENCY

After granting the defendants' motions to suppress all of the identifications made by the victim, and after granting the defendants' motions to suppress all the evidence seized from their persons and from Tinney's car, the trial court granted the defendants' motions to dismiss the informations pending against them with prejudice. Those motions were based in part on Practice Book § 815 (5) and General Statutes § 54-56, which permit such a dismissal "based on the insufficiency of evidence or cause to justify the . . . continuing of such information . . . or the placing of the defendant on trial . . . ." Practice Book § 815 (5); see *State* v. *Bellamy,* 4 Conn. App. 520, 525–28, 495 A.2d 724 (1985). The trial court briefly summarized its reasons for its dismissals and suppression of evidence as follows: "[T]his decision on my part is due to two things basically; improper police conduct and the complainant's total lack of credibility." We have held that the conduct of the police in this case was not constitutionally improper. We have also noted that, in ruling on the motions to suppress, the trial court exceeded its proper bounds in assessing the victim's credibility. It also exceeded those bounds in ruling on the defendants' motions to dismiss, because "[o]n a motion to dismiss an information, the proffered proof is to be viewed most favorably to the state." *State* v. *Morrill,* 193 Conn. 602, 611, 478 A.2d 994 (1984). Thus, the court erred in granting the defendants' motions to dismiss the informations based on evidentiary insufficiency.

## B

### DOUBLE JEOPARDY PRINCIPLES

The defendants claim that, even if the court was incorrect in granting their motions to dismiss based on evidentiary insufficiency, its judgment of dismissal should be sustained insofar as it dismissed the counts of the informations charging sexual assault in the second degree. They argue, on the basis of the statutes and on the bills of particulars filed by the state, that the offense of sexual assault in the second degree is a lesser included offense with respect to the offense of risk of injury or impairing the morals of a child, and that, therefore, double jeopardy principles mandate the dismissal of the lesser offense. The short answer to this argument is that it is premature and that it misconceives the nature of the double jeopardy protection.

As the state correctly points out, the double jeopardy clause protects generally against three evils: a second prosecution for the same offense after a prior acquittal; a second prosecution for the same offense after a prior conviction; and multiple punishments for the same offense. *North Carolina* v. *Pearce,* 395 U.S. 711, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969); see *State* v. *Goldson,* 178 Conn. 422, 423 A.2d 114 (1979). Since there is no issue of subsequent prosecution in this case, the only double jeopardy protection implicated by the defendants' claim is the protection against multiple punishments for the same offense.

We need not, and do not, decide whether under the bills of particulars filed in these cases the second degree sexual assault offenses charged against these defendants are lesser included offenses with respect to the charges of risk of injury or impairing the morals of a child. Cf. *State* v. *Shaw,* 186 Conn. 45, 51–53, 438 A.2d

872 (1982). Putting a defendant to trial on both a greater and a lesser included offense does not offend the double jeopardy clause; it is only convicting him and thus imposing cumulative punishments for a greater and a lesser included offense that violates the double jeopardy clause. See *Missouri* v. *Hunter,* 459 U.S. 359, 366–69, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983). Indeed, since conceivably a defendant can be acquitted by a jury of a greater offense and convicted of an *uncharged* lesser included offense; *State* v. *Whistnant,* 179 Conn. 576, 427 A.2d 414 (1980); it is difficult to see why the state may not include in its information a specific lesser included offense, thus giving the defendant even more notice than he ordinarily would receive. At this stage of the proceedings, the double jeopardy clause does not require the dismissal of the charges of sexual assault in the second degree.

There is error in both cases, the judgments granting the motions to suppress and dismissing the informations are set aside and the cases are remanded for further proceedings according to law.

In this opinion the other judges concurred.