STATE OF CONNECTICUT *v.* ANDREAS VAN DER WERFF
(3221)

BORDEN, SPALLONE and BIELUCH, Js.

Argued May 9—decision released July 29, 1986

*Gerald M. Klein,* for the appellant (defendant).

*Ian R. McMillan,* special assistant state's attorney, with whom, on the brief, were *John J. Kelly,* chief state's attorney, and *James G. Clark,* deputy assistant state's attorney, for the appellee (state).

BORDEN, J. The defendant appeals from the judgment of conviction of possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a). This conviction was based on his conditional plea of nolo contendere, pursuant to General Statutes § 54-94a,[1] fol-

---

[1] The defendant's written plea of nolo contendere in the record does not indicate that it was made "conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure," as required by General Statutes § 54-94a. The parties, however, have treated it as such a conditional plea, and we review it accordingly. The judgment file, moreover, incorrectly states that the defendant "said that he was guilty." The judgment file should be corrected to recite the defendant's nolo contendere plea.

lowing the denial of his motion to suppress evidence seized from his suitcase at Bradley International Airport in Windsor Locks. The principal issue is whether the trial court erred in finding that the facts of this case are distinguishable from the facts in *Florida* v. *Royer*, 460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983), in which the Supreme Court held that a similar airport search was tainted. We find no error.

In a thorough and analytical memorandum of decision, the trial court found the following facts: The defendant was returning to his home in Hartford from a vacation in Florida. He walked up to the Delta Airlines ticket terminal in the Fort Lauderdale-Hollywood International Airport approximately five minutes before the scheduled departure time of flight 560 to Bradley Airport. He paid with cash for a one way ticket. He glanced about from side to side and appeared nervous as he asked the attendant if he could carry his single piece of luggage onto the plane. When told that he could not, he repeated his request. He finally checked his suitcase and watched anxiously as it was conveyed to the airplane.

Deputy Sheriff Daniel DeCoursey, of the sheriff's department of Broward County, Florida, believed that the defendant's nervous mannerisms matched the so-called "drug courier profile,"[2] a group of characteristics developed by law enforcement agencies and used to identify persons who illegally transport narcotics along the nation's airways. The defendant, unaware that he had aroused suspicion, boarded the plane. DeCoursey telephoned to inform the Connecticut state police that he believed that the defendant possessed illegal narcotics.

---

[2] The drug courier profile is "an informally compiled abstract of characteristics thought typical of persons carrying illicit drugs." *United States* v. *Mendenhall*, 446 U.S. 544, 547 n.1, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980).

In response to DeCoursey's call, two undercover Connecticut state police officers who were assigned to Bradley Airport, Detective David Hutchinson and Sergeant William Burke, awaited the arrival of the defendant's flight. They saw him leave the plane and walk 300 yards from the jetway to the main concourse. As he walked, the defendant's constant glancing over his shoulder caused him to stand out from the other passengers. His extreme nervousness continued as he waited at the baggage terminal. A narcotics detection dog positioned along an interior baggage conveyor registered a weak response to the defendant's suitcase. The dog's handler then radioed this response to Hutchinson and Burke.

The defendant picked up his suitcase and began to walk in a direction away from the public exits. Hutchinson and Burke, both dressed in plain clothes, approached him. Hutchinson asked to see the defendant's driver's license and ticket receipt and, noticing that the defendant's hands were trembling and that he was sweating profusely, asked him why he was nervous. The defendant answered that he was nervous because of his unexpected confrontation by two state policemen. He handed his license and receipt to Hutchinson. Hutchinson indicated that he would like to search the suitcase, and asked the defendant if he would mind moving to a location out of public view. There was no indication that the officers would have insisted on retaining the defendant had the defendant been unwilling to leave the baggage area. Instead, the defendant, possibly to avoid embarrassment and preferring to continue the encounter, if at all, in a more private location, replied that he would not mind.

With Hutchinson in possession of the defendant's license and ticket receipt and the defendant carrying the suitcase, the three men walked approximately twenty feet to a room secured by a punch-type cipher

lock. Hutchinson punched in the combination and opened the door to a small room without chairs. They entered the room. Hutchinson returned the defendant's license and receipt to him. Hutchinson had had possession of the license and receipt for approximately two minutes. Although the room was not locked from the inside, the defendant believed that it was. The defendant stood near a wall with his suitcase, next to Hutchinson, while Burke stood back. Neither officer touched the defendant or exhibited a weapon. After a brief conversation, Hutchinson asked the defendant if he could search the suitcase. The defendant consented orally. Up to the time when he consented, he had been in the room for three minutes. Hutchinson reached into the suitcase and found an envelope containing white powder. He then placed the defendant under arrest.

The entire encounter between the police officers and the defendant lasted no longer than five minutes. Neither police officer displayed a weapon or physically contacted the defendant. Neither attempted to intimidate him, either physically or verbally, by tone of voice or general demeanor. Both were courteous and asked, but did not demand, that the defendant comply with their request. Neither advised the defendant that he might refuse their request. There was no evidence of coercion.

On the basis of these facts, the court concluded that the defendant was "seized," within the meaning of the fourth amendment, near the baggage terminal shortly before being taken to the room, and that he was not free to leave thereafter. The court also concluded that the seizure was based on reasonable and articulable suspicion, that the scope of the seizure was permissible, and that the defendant's consent to search the suitcase was voluntarily given. Accordingly, the court denied the motion to suppress. This appeal followed.

## I

The defendant first gives a glance at the argument that the initial seizure was unlawful, but he does not seriously press this claim in his brief. We agree with the state that the trial court did not err in concluding that the initial seizure of the defendant was reasonable. The degree of the match between his behavior in the Florida airport and the drug courier profile; see footnote 2, supra; was further corroborated by his nervous behavior after leaving the plane at Bradley Airport, the weak but not exculpatory response of the narcotics trained dog, and the defendant's additional extreme nervousness upon being approached and questioned by Hutchinson and Burke. In the aggregate, these facts and observations were sufficient to give the police officers reasonable and articulable suspicion to stop the defendant. *State* v. *Mitchell*, 7 Conn. App. 46, 57–60, 507 A.2d 1017 (1986), rev'd in part, 204 Conn. 187, 527 A.2d 1168 (1987). Thus, the stop was justified at its inception. Id.

The defendant's principal argument[3] is that the scope of the stop exceeded its permissible limits and resulted in the functional equivalent of an arrest based on less than probable cause. In this regard, the defendant relies solely on *Florida* v. *Royer,* supra. We disagree. We conclude that the trial court was correct in reading *Royer* as distinguishable from the facts of this case.

---

[3] Although the defendant concedes that he did not raise a state constitutional claim in the trial court, and although he did not raise it in his initial brief in this court, in his reply brief he indicated that he would do so at oral argument. That effort was no more, however, than a passing reference to *State* v. *Kimbro,* 197 Conn. 219, 496 A.2d 498 (1985), for the proposition that we are free to interpret our own constitution differently from the United States constitution. We do not regard the defendant to have adequately raised and briefed a state constitutional claim. We therefore confine our discussion to the theory on which the case was tried and decided in the trial court, and briefed in this court. *Travelers Ins. Co.* v. *Hendrickson,* 1 Conn. App. 409, 411 n.3, 472 A.2d 356 (1984).

In *Royer,* the defendant had aroused the suspicion of two narcotics agents in the Miami airport as he proceeded to board a plane, having checked his luggage. They approached him and asked to speak to him. Upon their request, but without his oral consent, Royer gave them his airline ticket and driver's license. On the basis of certain discrepancies in these items and on observations of Royer's increased nervousness, the officers identified themselves as narcotics investigators and told him that they suspected him of transporting narcotics. They did not return his ticket and identification, but asked him to accompany them to a small room approximately forty feet away. Without responding, Royer went with them to the room. Without his consent, one of the officers retrieved Royer's two suitcases from the plane and returned them to the room. Royer was asked if he would consent to a search of the suitcases. He did not respond orally, but produced a key and unlocked one of the suitcases, and did not object to one of the detectives opening the other by force. Marihuana was found in both suitcases, and Royer was arrested. The entire episode took about fifteen minutes from the time the officers approached him to his arrest.

A plurality of the United States Supreme Court, (White, Marshall, Powell and Stevens, Js.), "agree[d] that had Royer voluntarily consented to the search of his luggage while he was *justifiably* being detained on reasonable suspicion, the products of the search would be admissible against him." (Emphasis added.) Id., 502. The same plurality, however, held that, under the facts of that case, the permissible scope of an investigative stop had been exceeded. They ruled "that at the time Royer produced the key to his suitcase, the detention to which he was then subjected was a more serious intrusion on his personal liberty than is allowed on mere suspicion of criminal activity"; id., 502; and that "[a]s a practical matter, Royer was under arrest." Id., 503.

Therefore, because "Royer was being illegally detained when he consented to the search of his luggage . . . the consent was tainted by the illegality and was ineffective to justify the search." Id., 507–508.

In a concurring opinion, Justice Powell "agree[d] with the plurality that as a practical matter [Royer] was then under arrest, and his surrender of the luggage key to the officers cannot be viewed as consensual." Id., 509 (Powell, J., concurring). Justice Powell relied on the facts that, after accompanying "the officers to a more private place" and before surrendering the key to his luggage, "Royer then found himself in a small window-less room—described as a 'large closet'—alone with two officers who, *without his consent, already had obtained possession of his checked luggage.* In addition, they had retained his driver's license and airline ticket." (Emphasis added.) Id., 508.

Both the *Royer* plurality and Justice Powell agreed that each airport stop and search case must pivot on its own facts. "We do not suggest that there is a litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop. Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment." Id., 506–507. "As the plurality opinion emphasizes, *ante,* at 506–507, the facts and circumstances of investigative stops necessarily vary." Id., 508.

The Supreme Court has subsequently read the *Royer* case as turning on the facts that "government agents stopped the defendant in an airport, *seized his luggage,*

and *took him to a small room* used for questioning, where a search of the luggage revealed narcotics. The court held that the defendant's detention constituted an arrest. [*Florida* v. *Royer,* supra, 503 (plurality opinion), 509 (Powell, J., concurring), 509 (Brennan, J., concurring in the result)]. As in *Dunaway* [v. *New York,* 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979)] though, the focus was primarily on facts other than the duration of the defendant's detention—particularly the fact that the police *confined the defendant* in a small airport room for questioning." (Emphasis added.) *United States* v. *Sharpe,* 470 U.S. 675, 105 S. Ct. 1568, 1574, 84 L. Ed. 2d 605 (1985).

There are two critical factual distinctions between this case and *Royer.* First, in this case, the trial court found that the officers would not have insisted upon taking the defendant to the room had he been unwilling to leave the baggage area, that the defendant knew that a search of his luggage was contemplated before he had accompanied the officers to the room, that the defendant in order to avoid possible embarrassment preferred to continue the encounter in a more private place, and that the defendant agreed after two minutes of questioning to relocate to an area out of the public view.[4] Thus, unlike *Royer,* in this case, it can not be fairly said of the defendant that the police officers "*took him* to a small room for questioning"; *United*

---

[4] Nowhere in his brief did the defendant challenge the evidentiary sufficiency of these critical factual findings. He first did so part way through his oral argument in this court, after opening his argument with the statement that he agreed with the findings of the trial court. We do not believe that such a belated attempt to raise such an important claim properly presents the issue to us. We therefore disregard this claim of the defendant, and take the factual findings of the trial court as expressed in its memorandum of decision and as briefed by the parties. "Care must be taken . . . to examine . . . [the] findings of fact that the trial court actually made in its decision to deny the motion to suppress." *State* v. *Brown,* 198 Conn. 348, 360, 503 A.2d 566 (1986) (*Healey, J.,* dissenting).

*States* v. *Sharpe,* supra (emphasis added); in the same sense in which Royer was taken to the room. Nor was this defendant *"confined* in a small room"; id. (emphasis added); in the same sense that Royer was confined. This defendant was in the room by his own consent.

We are aware that the trial court in this case also found that the "defendant was seized near the baggage terminal shortly before *being taken* to the private room . . . . " (Emphasis added.) This finding, however, which was made in the context of the identification of the point at which the defendant was "seized," in constitutional parlance, must be read together with the later, more expansive findings of the trial court on the same issue. Those later findings are that "[t]here is no indication that the officers would have insisted had Van Der Werff been unwilling to leave the baggage area. Rather, it appears that Van Der Werff, possibly to avoid embarrassment, preferred to continue the encounter, if at all, in a more private location. The scope of this temporary detention was not impermissibly enlarged merely because the defendant agreed after two minutes of questioning to relocate twenty feet to an area out of the public view." Thus, the gist of the trial court's findings in this regard is that, unlike the defendant in *Royer,* who was not told that his luggage was to be searched when he was taken to the room and who gave no oral consent to the relocation to that room, the defendant in this case was told, before accompanying the police to the room, that they wished to search his luggage, and consented to having that done out of the public's eye.[5]

---

[5] This consensual aspect of the relocation of the defendant also distinguishes this part of the case from our analysis in *State* v. *Mitchell,* 7 Conn. App. 46, 507 A.2d 1017 (1986), rev'd in part, 204 Conn. 187, 527 A.2d 1168 (1987). In *Mitchell,* we noted that "[r]elocation of a temporarily detained suspect is permissible incident to an investigative stop if it does not make the stop unreasonably more intrusive. [*United States* v. *Vanichromanee,* 742 F.2d 340, 345 (7th Cir. 1984).] An important factor in evaluating such

The second critical factual difference from *Royer* is that in this case the defendant retained possession of his suitcase until the moment that Hutchinson searched it. Indeed, the trial court's factual findings do not even indicate that the defendant ever relinquished his hold on the suitcase. The findings were as follows: The defendant "stood near a wall with his suitcase, next to Hutchinson . . ." "After some brief conversation Hutchinson asked if he could search the suitcase, and the defendant orally consented . . . ." "Hutchinson reached in and found a single envelope containing white powder." Thus, unlike in the *Royer* case it cannot be said in this case that the defendant was with officers "who, without his consent had obtained possession of his checked luggage." *Florida* v. *Royer,* supra, 508 (Powell, J., concurring). Nor can it be said of the defendant that the police "seized his luggage. . . ." *United States* v. *Sharpe,* supra.

These two factual aspects sufficiently distinguish this case from *Florida* v. *Royer,* supra, on which the defendant relies. We agree with the trial court that the scope of the investigative stop was not impermissibly expanded by the consensual relocation of the defendant, who retained control of his luggage until the moment of the consent, for a distance of twenty feet from the baggage terminal to the private room. Thus, the defendant's consent to the search was not tainted by an illegal detention.

## II

This leaves for consideration the defendant's final argument. He claims that, even if the initial stop was justified and its scope not impermissibly enlarged, there

a relocation is whether it is to a more police-oriented institutional setting, such as a police station or interrogation room. Id." *State* v. *Mitchell,* supra, 63. There, we were discussing a relocation of a seized suspect by the police without the suspect's consent. In this case, the trial court found in effect that the defendant consented to the relocation to a more private place.

was insufficient evidence to support the court's finding of a voluntary consent to the search of his suitcase. We disagree.

Whether a search was based on consent, which the state has the burden of establishing, requires a finding of voluntariness, as opposed to an acquiescence to lawful authority. *State* v. *Cardona,* 6 Conn. App. 124, 134, 504 A.2d 1061 (1986). The consent must be free and voluntary, which is a question of fact to be determined from the totality of the circumstances. Id. The ultimate question "is whether the will of the consenting individual was overborne, or whether the consent was his unconstrained choice." *State* v. *Cobbs,* 7 Conn. App. 656, 659, 510 A.2d 213 (1986). The trial court's finding must stand unless it is clearly erroneous. Id.

Here, the court found that the state met its burden of proof to establish that the defendant's consent to search the suitcase was voluntary. Although he was not advised that he need not comply with the requests, and although knowledge of the right to refuse to consent is an important element in the voluntariness determination; *Dotson* v. *Warden,* 175 Conn. 614, 619, 402 A.2d 790 (1978); such advice is not a prerequisite to a voluntary consent. *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 248–49, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). In support of its finding of voluntariness, the court also found that both officers were in plain clothes. Neither displayed a weapon, made physical contact with the defendant or intimidated him in any way. Both were courteous and asked, but did not demand, that he comply with their requests. There was no coercion. We cannot conclude that the trial court's finding of a voluntary consent to search was clearly erroneous.

There is no error.

In this opinion the other judges concurred.